UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JIM HAWK TRUCK-TRAILERS OF SIOUX FALLS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CROSSROADS TRAILER SALES & SERVICE, INC., ALVIN SCHOLTEN, MARK SNEVE, MICHAEL FALOR, DAVID JENSEN, TRACY THOMPSON, NICK BIG EAGLE, CHAZ KOHERST, TAYLOR LARSON, DEREK FALOR, <br><br> Defendants. | **4:20-CV-04058-KES** <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL [DOCKET NO. 116] AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO COMPEL [DOCKET NO. 119]** |

**INTRODUCTION**

This matter is before the court on the complaint of plaintiff Jim Hawk Truck-Trailers of Sioux Falls, Inc. ("Jim Hawk") alleging misappropriation of trade secrets and various other tort claims. See Docket No. 1. Defendants Crossroads Trailer Sales and Services, Alvin Scholten, Mark Sneve, Michael Falor, David Jensen, Tracy Thompson, Nick Big Eagle, Chaz Koherst, Taylor Larson, and Derek Falor (collectively "Defendants") filed a counterclaim alleging breach of contract—bad-faith refusal to pay wages. See Docket Nos. 37, 38, 39, 41, 42. This court has original jurisdiction over this matter under 28 U.S.C. § 1331 because the action was brought under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836.

Pending are Jim Hawk and Defendants' cross motions to compel discovery.  <u>See</u> Docket Nos. 116 & 119.  Both parties oppose the motions against them.  <u>See</u> Docket Nos. 141 & 145.  The district court, the Honorable Karen E. Schreier, referred the motions to this magistrate judge for determination pursuant to 28 U.S.C. § 636(b)(1)(A).  <u>See</u> Docket No. 163.

## FACTS

Jim Hawk brought suit against Defendants alleging claims of misappropriation of trade secrets, breach of duty of loyalty, tortious interference with business relations, tortious interference with employee relationships, unfair competition, unjust enrichment, and defamation against Crossroads and former employees.  <u>See</u> Docket No. 1.[1]  Jim Hawk asserts "Crossroads is improperly and unfairly competing and/or attempting to compete with Jim Hawk's existing trailer business and other business by hiring away a significant number of Jim Hawk's senior management and sales force."  Docket No. 1, p. 12.  Jim Hawk alleges Crossroads has obtained confidential trade secrets from Jim Hawk's former employees and have used these trade secrets to increase their profits.  Docket No. 1.

---

[1] Misappropriation of trade secret claims are against all defendants, breach of duty of loyalty is against the individual defendants, tortious interference with business relations is against all defendants, tortious interference with employee relationships is against Crossroads and Mr. Scholten, unfair competition claims are against all defendants, unjust enrichment claims are against all defendants, and the defamation claim is against Mr. Scholten.  <u>See</u> Docket No. 1.

In response, Defendants have denied Jim Hawk's allegations and filed counterclaims against Jim Hawk alleging breach of contract and bad-faith refusal to pay wages.  See Docket Nos. 37, 38, 39, 41, 42.  Defendants allege that after the individuals resigned from Jim Hawk and joined Crossroads, Jim Hawk "refused to pay commission it owed to Defendants and Counterclaim Plaintiffs Mark Sneve, David Jensen, Tracy Thompson, and Michael Falor." Docket No. 117, p. 2.

Since this case began in March 2020, the parties have had long-standing disputes on discovery.  The parties have provided several responses to discovery requests and had several correspondences and meet and confer conferences to discuss the many discovery issues that have delayed this litigation.  See Docket Nos. 118-2 through 118-14, 118-19 through 118-31, 155-10, 155-12, 155-14; Docket No. 120-1.  Additionally, Jim Hawk has previously moved to compel discovery, which this court decided on July 29, 2022.  See Docket Nos. 104 & 136.  Now before the court are Jim Hawk's second motion to compel and Defendants' first motion to compel discovery. See Docket Nos. 116 & 119.

Defendants' motion requests that the court compel Jim Hawk to: (1) produce the income statements for all Jim Hawk branch locations considered in Jim Hawk's expert report; (2) produce additional discovery responses and documents responsive to the individual Counterclaim Plaintiffs' counterclaims for unpaid commissions; (3) review and produce additional Electronically Stored Information ("ESI") discovery; and (4) change the

designation for all discovery materials, aside from financial records, from Attorneys' Eyes Only to Confidential.  See Docket No. 117 & 175.  Jim Hawk's second motion requests that the court compel Defendants to provide additional documents responsive to Requests for Production Nos. 7, 8, 33, 65-76, review and produce additional ESI discovery, and produce additional financial documentation.  See Docket No. 120.  The court will address both motions, starting with the Defendants' first motion to compel.

## DISCUSSION

### A.    Standards Governing Discovery

Federal Rule of Civil Procedure 26(b)(1) sets forth the scope of discovery in civil cases pending in federal court:

> *Scope in General.*  Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within the scope of discovery need not be admissible in evidence to be discoverable.

See FED. R. CIV. P. 26(b)(1).

If a party fails to respond to a proper request for discovery, or if an evasive or incomplete response is made, the party requesting the discovery is entitled to move for a motion compelling disclosure after making a good-faith effort to resolve the dispute by conferring first with the other party.  See FED. R. CIV. P. 37(a).

The scope of discovery under Rule 26(b) is extremely broad.  See 8 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2007 (3d ed. Oct. 2020 update).  The reason for the broad scope of discovery is that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.  To that end, either party may compel the other to disgorge whatever facts he has in his possession."  Id. (quoting Hickman v. Taylor, 329 U.S. 495, 507-08 (1947)).  The Federal Rules distinguish between discoverability and admissibility of evidence.  FED. R. CIV. P. 26(b)(1), 32, and 33(a)(2) & (c).  Therefore, the rules of evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial.  But these considerations are not inherent barriers to discovery.

"Relevancy is to be broadly construed for discovery issues and is not limited to the precise issues set out in the pleadings.  Relevancy . . . encompass[es] 'any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.' " E.E.O.C. v. Woodmen of the World Life Ins. Soc'y, No. 8:03CV165, 2007 WL 1217919, at *1 (D. Neb. Mar. 15, 2007) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).  The party seeking discovery must make a "threshold showing of relevance before production of information, which does not reasonably bear on the issues in the case, is required."  Woodmen of the World, 2007 WL 1217919, at *1 (citing Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992)).  "Mere speculation that information might be useful will not suffice; litigants seeking to compel discovery must describe[,] with a

reasonable degree of specificity, the information they hope to obtain and its importance to their case." Woodmen of the World, 2007 WL 1217919, at *1 (citing Cervantes v. Time, Inc., 464 F.2d 986, 994 (8th Cir. 1972)).

Discoverable information itself need not be admissible at trial; rather, the defining question is whether it is within the scope of discovery. See FED R. CIV. P. 26(b)(1). Additionally, the court may limit the frequency and extent of discovery. See FED. R. CIV. P. 26(b)(2); see also Roberts v. Shawnee Mission Ford, Inc., 352 F.3d 358, 361 (8th Cir. 2003) ("The rule vests the district court with discretion to limit discovery if it determines, inter alia, the burden or expense of the proposed discovery outweighs its likely benefit."); Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Caton, 136 F.R.D. 682, 684-85 (D. Kan. 1991) ("All discovery requests are a burden on the party who must respond thereto. Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden.").

**B.  Defendants' and Counterclaim Plaintiffs' Motion to Compel Discovery**

**1.   Have the Defendants Exhausted Their Obligations to Meet and Confer under Fed. R. Civ. P. 37(a)(1)?**

A prerequisite to filing a motion to compel discovery is the filing of "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). Similarly, under the District of South Dakota local rule 37.1, "[a] party filing a motion concerning a

discovery dispute must file a separate certification describing the good faith efforts of the parties to resolve the dispute."  D.S.D. Civ. LR 37.1.

The certification mentioned in FED. R. CIV. P. 37 must include "the names of the parties who conferred or attempted to confer, the manner by which they communicated, the dispute at issue, as well as the dates, times, and results of their discussions, if any."  Shuffle Master, Inc. v. Progressive Games, Inc., 170 F.R.D. 166, 170-171 (D. Nev. 1996).  "Good faith" requires that the parties made a genuine attempt to resolve the discovery dispute without involving the court.  Id.  Finally, "conferment" requires the parties "to have had an actual meeting or conference."  Id.  Thus, before making a motion to compel, "a moving party must personally engage in two-way communication with the nonresponding party to meaningfully discuss each contested discovery dispute in a genuine effort to avoid judicial intervention."  Id.  Unilaterally sending correspondence demanding that the other side comply with a discovery request does not satisfy the requirement.  Id. at 172.

Where there is no legitimate reason for expediency, counsel calling opposing counsel and leaving a vague message two hours before filing the discovery motion does not satisfy the meet-and-confer requirement.  Alexander v. Federal Bureau of Investigation, 186 F.R.D. 197, 198-199 (D.D.C. 1999). Nor is the meet-and-confer requirement rendered moot merely because when counsel did file the discovery motion it was opposed by the other party.  Id. The purpose of the meet-and-confer requirement is to "force litigants to attempt

to resolve, or at least narrow, the disputed issues to prevent the unnecessary waste of time and effort on any given motion." Id. at 199.

Nor is the meet-and-confer requirement satisfied by the sending of a letter that indicated that a motion to compel would be filed if the opposing party did not comply with discovery requests. Bolger v. District of Columbia, 248 F.R.D. 339, 343-344 (D.D.C. 2008). Likewise, sending a letter discussing the discovery issue did not satisfy the meet-and-confer requirement or the prerequisite of a certification of having conferred in good faith. Ross v. Citifinancial, Inc., 203 F.R.D. 239, 239-40 (S.D. Miss. 2001). The court noted that the requirement was not "an empty formality," and that, in many cases, obliging the attorneys to meet and confer resolved the discovery dispute. Id.

The decision in Cotracom Commodity Trading Co. v. Seaboard Corp., 189 F.R.D. 456 (D. Kan. 1999), illustrates how fact-dependent the inquiry is. In that case, four telephone calls by the movant on a motion to compel were not enough to satisfy the meet-and-confer requirement where all four calls took place while opposing counsel was out of the country on vacation. Id. at 458-459. As the court explained, the meet-and-confer requirement is intended to require counsel to "converse, confer, compare views, consult and deliberate." Id. at 459. Therefore, sending a letter or making an oral request that simply demands compliance with the discovery request seldom satisfies the meet-and-confer requirement. Id. The court frowned upon the movant's setting of an arbitrary deadline for the filing of a motion to compel because the facts showed that the parties were not at impasse. Id. They had yet to discuss the

genuineness of the opposing party's objections; what, if any, documents the discovering party was reasonably capable of producing; and what specific, genuine issues remained that could not be resolved without the court's intervention.  Id.

In RLI Ins. Co. v. Conseco, Inc., 477 F. Supp. 2d 741 (E.D. Va. 2007), a party was being deposed and "refused to answer nine questions" during the deposition based on attorney-client privilege or work-product doctrine.  Id. at 745.  The deposing party sought an order compelling the deponent to answer the questions.  Id.  The party who had refused to answer argued that the motion to compel should be denied because the movant had failed to comply with the meet-and-confer requirement before filing the motion.  Id. at 745-746.  The court found that the movant had satisfied the meet-and-confer requirement by making several suggestions for compromise, both by telephone contact and by letter, and by supplying the resisting party with a list of the specific questions the movant would be seeking to compel.  Id.

On the other hand, courts have, in very limited circumstances, excused a moving party's failure to satisfy the meet-and-confer requirement.  In Freiria Trading Co. v. Maizoro S.A. de C.V., 187 F.R.D. 47 (D.P.R. 1999), the court excused the movant's failure to satisfy the meet-and-confer requirement where the opposing party's conduct was not just a refusal to provide requested discovery, but also constituted a direct violation of an order from the court.  Id. at 48.  See also Bolger, 248 F.R.D. at 343-344 (excusing the failure of the movant to satisfy the meet-and-confer requirement because of the long-

standing record of the opposing party's refusal to comply with both the plaintiff's requests and the court's specific orders to produce certain discovery).

### a.   Application of the Standard to Scholten's Interrogatory No. 2

Jim Hawk argues "Defendants did not previously raise issues with [their] prior response to Scholten's Interrogatory No. 2 until immediately before they filed this Motion." Docket No. 141, p. 7.  In response, Defendants indicated that "[a]lthough a specific reference to Scholten's Interrogatory Number 2 . . . was not explicitly mentioned in the Counterclaim Plaintiff's correspondences . . . Plaintiff was certainly on notice that Defendants were seeking supplemental answers." Docket No. 175, p. 7.  After review of each of the parties meet-and-confer correspondences, no letter raises an issue with Jim Hawk's response to Scholten's Interrogatory No. 2.  See Docket Nos. 118-11, 118-12, 118-2, 118-3, 118-13, 118-28.

The only correspondence that generally discusses Scholten's Interrogatory No. 2 is Defendant's letter from March 16, 2022.  See Docket No. 176-4.  In this letter, Defendants stated, "Plaintiff's answers to the Individual Defendants' interrogatories that relate to their unpaid commission claims are still deficient." Id.  Scholten's Interrogatory No. 2 requested Jim Hawk identify its 2019 annual net income, and applicable adjustments, that would be considered in calculating Scholten's commission payment.  Docket No. 118-5.  Because Defendants did not specifically discuss with Jim Hawk the deficiencies Defendants perceived with regard to the response to Scholten's Interrogatory No. 2--as Defendants did with the other interrogatories--the court

10

finds that Defendants failed to meet their obligations under FED. R. CIV. P. 37(a)(1) and D.S.D. LR 37.1.  Generally arguing there were deficiencies with Jim Hawk's answers to the individual defendants' interrogatories without specifying which interrogatory was deficient and what additional information they felt was discoverable is not the "good faith" effort required under the rules.

### b.   Application of the Standard to Sneve's Interrogatory Nos. 1 & 2

Jim Hawk also argues Defendants failed to satisfy the meet and confer requirement regarding Sneve's Interrogatory Nos. 1 and 2.  Docket No. 141, p. 8.  Jim Hawk asserts that while issues with these responses were discussed in the past, Jim Hawk provided supplemental responses and Defendants never communicated dissatisfaction with the supplements.  Id.  Defendants argue they had communicated issues with Jim Hawk's responses and "should not have had to communicate these requests a third time" after the supplemental responses did not adequately respond to the interrogatories.  See Docket No. 175, pp. 5, 10-14.

In a May 7, 2021, and July 30, 2021, correspondence, Defendants notified Jim Hawk that their objections to Sneve's Interrogatory No. 1 lacked merit and requested answers.  Docket No. 118-11, p. 4; Docket No. 118-12, p. 4.  In a February 9, 2022, correspondence, Defendants notified Jim Hawk that their response to Sneve's Interrogatory No. 1 was incomplete, as it did not contain an explanation of "the precise amount of both Sneve's fourth quarter 2019 commission payment and the precise amount of the [Property and Casualty Insurance] deduction."  Docket No. 118-13, p. 1.  Also in the

February 9, 2022, correspondence, Defendants notified Jim Hawk that their response to Sneve's Interrogatory No. 2 was deficient and requested responses with Bates number to the income reports of the parts and services departments for quarter four 2019, quarter one 2020, and specifically for the income statements for February 2020.  Id. at 2.  These issues were also addressed in a letter dated March 2, 2022.  See Docket No. 118-28, pp. 3-4.

Jim Hawk asserts they had not received any communications regarding additional issues with the supplemental responses they provided to Defendants on April 1, 2022, as "Defendants' brief was the first time [Jim Hawk] became aware of the purported issues."  Docket No. 141, p. 8.  This is simply not the case.  The issues Defendants have with Jim Hawk's responses to Sneve's Interrogatory Nos. 1 & 2 in their motion to compel before the court are the same issues they addressed in previous correspondences.  Compare Docket No. 175, pp. 10-14, with Docket No. 118-12, 118-13, 118-28.  Jim Hawk's supplemental responses to Sneve's Interrogatory Nos. 1 & 2 from April 1 do not completely address the Defendants' issues—the amount of insurance payment for the service department which affected Sneve's commission in 2019 and specific income statements from the service department.  Thus, Defendants have made a "good faith" effort to meet and confer and resolve their issues with Jim Hawk's responses to Sneve's Interrogatory Nos. 1 & 2.

### c.  Application of the Standard to Sneve's Requests for Production

Jim Hawk also argues Defendants did not meet and conferred with it regarding its responses to Sneve's Requests for Production of Documents.

Docket No. 141, p. 8.  Jim Hawk asserts "Defendants did not identify an issue with [Jim Hawk's] responses in any of the letters Defendants identified as comprising their meet and confer."  Id.

In response, Defendants assert they "met and conferred with [Jim Hawk] to secure supplemental discovery regarding the insurance payment and the missing monthly income statements for the service department" in a correspondence from February 9, 2022, and during a conversation from February 25, 2022.  Docket No. 175, p. 15.  The court agrees.

In the February 9 correspondence, Defendants stated that no "documentation produced by Jim Hawk" identified the insurance payments deducted from Sneve's earnings.  Docket No. 118-13, p. 1.  And Defendants asserted that Jim Hawk's "document production is insufficient because it does not include any income statement that may be applicable to the service department."  Id. at 2.  This correspondence satisfies Defendants' obligations to meet and confer under FED. R. CIV. P. 37(a)(1) and D.S.D. LR 37.1.

### d.    Application of the Standard to Falor's Interrogatory No. 2 and Thompson and Jensen's Interrogatory No. 1

Jim Hawk argues Defendants failed to sufficiently meet and confer regarding deficiencies in their responses to Falor's Interrogatory No. 2 and Thompson and Jensen's Interrogatory No. 1.  Docket No. 141, p. 8.  Jim Hawk asserts that while issues with their responses had previously been addressed, Defendants did not provide notice that the supplemental responses they provided were deficient.  Id.

Defendants addressed deficiencies in Jim Hawk's responses to these interrogatories on July 30, 2021, and February 9, 2022. <u>See</u> Docket Nos. 118-12 & 118-13. Jim Hawk provided supplemental responses to these interrogatories on April 1, 2022. <u>See</u> Docket Nos. 118-8, 118-9, 118-10. While Defendants did not communicate issues with these responses to Jim Hawk until filing this motion to compel, Jim Hawk has conceded that "it inadvertently included some documents that were not directly relevant to the Interrogatory." Docket No. 141, p. 16. Defendants now indicate Jim Hawk has identified responsive documents in their response to the motion to compel, but they are incomplete. Docket No. 175, p. 19.

It is clear to the court that the parties are aware of the discovery issues surrounding these specific interrogatories. This motion is not the first time Jim Hawk has been made aware of deficiencies. <u>See</u> Docket Nos. 118-12 & 118-13. Simply arguing the parties had not met and conferred on these issues due to their supplemental responses (which Jim Hawk concedes contained many irrelevant documents) is a nonstarter. The question before the court is whether there was a "good faith" effort by the parties to resolve these discovery disputes. The court believes there has been and will address these interrogatories on the merits.

### 2. Whether Jim Hawk Should Be Ordered to Produce Income Statements from Other Branch Locations

The Defendants request that the court compel Jim Hawk to produce income statements from 2016 to 2021 for all the locations within the Jim Hawk Group, not just the Sioux Falls branch location that is part of this litigation.

14

Docket No. 117, p. 4.  Defendants assert this discovery is relevant because Jim Hawk's expert considered the profits of all Jim Hawk branches to calculate Jim Hawk's alleged lost profit.  Id.  Defendants believe these requested income statements respond to request for production nos. 16, 18, and 26.  Id. at 5; see Docket No. 118-4, pp. 6-7, 10.

Jim Hawk opposes this request, arguing the income statements from other Jim Hawk branches are not proportional to the needs of the case, "[d]efendants have received all data relied upon by [their] expert," and they are not entitled to this financial data.  Docket No. 141, p. 3.

Parties are "entitled to discovery of its adversary's theory or measure of damages, its calculations under that theory, and expert opinions on the subject of damages." Henne v. Great River Regional Libr., No. 19-CV-2758 (WMW/LIB), 2021 WL 6804560, at *18 (D. Minn. Jan. 4, 2021) (quoting Marvin Lumber & Cedar Co. v. Norton Co., 113 F.R.D. 588, 593 (D. Minn. 1986)). Federal courts have held that financial data related to a party's claimed damages are discoverable.  See Unverferth Mfg. Co., Inc. v. Meridian Mfg., Inc., No. 19-CV-4005-LTS-KEM, 2020 WL 13015558 (N.D. Iowa Nov. 12, 2020) (holding audited financial statements related to calculating damages is relevant and discoverable); Uni-Splendor Corp. v. Remington Designs, LLC, No. CV 16-9319-PA, 2017 WL 10581102, at *4-5 (C.D. Cal. Sept. 5, 2017) (holding audited financial statements were relevant and discoverable to damages claim seeking lost profits); Ag Spectrum Co. v. Elder, No. 3:15-cv-00007-JEG-HCA, 2015 WL

11117312, at *1-2 (S.D. Iowa Aug. 28, 2015) (company-wide financial information used to calculate lost-profit damages is discoverable).

"The overwhelming weight of the caselaw is clear that an expert is required to provide the facts and data that the expert reviewed in preparing the opinion, regardless whether the expert actually relied on the facts and data in formulating the opinion." James River Ins. Co. v. Interlachen Propertyowners Ass'n., No. 14-cv-3434 (ADM/LIB), 2015 WL 9946407, at *5 (D. Minn. Dec. 21, 2015); see also McCormick v. Halliburton Energy Services, Inc., Civ. No. 11-1272, 2015 WL 2345310, *2 (W.D. Okla. May 14, 2015); FED. R. CIV. P. 26(a)(2)(B)(ii).  The district of South Dakota has held that "all documents and information disclosed" to an expert "in connection with [their] anticipated expert testimony are discoverable." Kooima v. Zacklift Intern., Inc., 209 F.R.D. 444, 447 (D.S.D. 2002); Katon v. United States, 5:16-CV-05023-JLV, 2018 WL 3079718, at *2 (D.S.D. June 21, 2018); Page v. Hertz Corp., No. CIV. 09-5098, 2011 WL 5553489, at *8, (D.S.D. Nov. 15, 2011) (the discoverable information includes the "raw data" used by the expert).

Defendants assert Jim Hawk's "methodology for calculating its alleged lost profit is based on comparing the performance" of its Sioux Falls branch to its other branch locations.  Docket No. 117, p. 4, 7.  Defendants believe Jim Hawk's expert considered branch performance "in the aggregate," and "[d]iscovery of the individual branch income statements could reveal mistakes in the aggregate calculations . . . different financial performance patterns at the individual branch locations . . . and may identify other weaknesses in the

16

expert's methodology and ultimate lost-profit calculation and opinion." Id. at 7. The court agrees.

Looking at Jim Hawk's expert's report, it is apparent the expert compared an aggregated income statement of the Jim Hawk Group to the income statement of Jim Hawk's Sioux Falls branch. See Docket No. 118-1, pp. 15-19; Docket No. 176-1, p. 4. In the schedule 3 graph of the expert report, the financial records of the "Jim Hawk Group" contain the revenue, costs, and income for all the branches from the years 2016 to 2021. Docket No. 176-1, p. 4. Schedule 3 does not contain specifics on which branch each financial statement comes from or any of the underlying source data of this aggregated summary of Jim Hawk Group's financials.

Because the expert used aggregated income statements in making their determination on Jim Hawk's lost profits, Defendants are entitled to the "raw data" that makes up the aggregated Jim Hawk Group financial statements. Page, 2011 WL 5553489, at *8; see also Ag Spectrum Co., 2015 WL 11117312, at *2 ("the production of summaries of financial information drawn from underlying source documents may be inadequate without disclosure of the source documents themselves."). The "raw data" in this case would be the income statements for each of the Jim Hawk Group branches that make up the aggregated financial statements in schedule 3 of the expert report.

Several district courts have "required production of corporate financial information," in cases dealing with claims of lost profits. Uni-Splendor Corp., 2017 WL 10581102, at *2-3 (compelling "all financial records" on sales and

17

revenue); <u>HM Elecs., Inc. v. R.F. Techs., Inc.</u>, No. 12cv2884-BAS (MDD), 2014 WL 7183493, at *9 (S.D.Cali. Dec. 15, 2014) (compelling "documents showing Plaintiff's revenue"); <u>Palm Bay Intern., Inc. v. Marchesi Di Barolo S.p.A.</u>, No. CV 09-601(ADS)(AKT), 2009 WL 3757054, at *4 (E.D.N.Y. Nov. 9, 2009) (compelling Plaintiff's annual financial statements as "they are reasonably calculated to lead to the discovery of admissible evidence."). This court finds that the income statements from all the branches that comprise the Jim Hawk Group are relevant, as the data could be used to rebut the findings by Jim Hawk's expert and allow Defendants to adequately defend themselves against a lost profit claim.

Jim Hawk rejects this conclusion by first arguing that "[i]n ruling on [Jim Hawk's first] motion to compel, the Court held that financial information from locations not involved in the dispute is not discoverable." Docket No. 141, p. 3; Docket No. 136, pp. 6-7. Jim Hawk mischaracterizes this court's previous ruling. In Jim Hawk's first motion to compel, Jim Hawk requested production of "[a]ny and all bank statements or records for [Defendants]." Docket No. 105-1, ¶ 13. This court held that because "Jim Hawk's claims only concern [Defendant's] hiring of the nine Individual Defendants, who all now work at its Luverne and Sioux Falls locations," and "has not alleged wrongful conduct beyond these two locations," only the bank statements from these two locations should be compelled. Docket No. 136, pp. 6-7. The court added that "Crossroads' bank statements are relevant to Jim Hawk's claims of misappropriation of trade secrets, tortious interference with business relations

18

and employee relationships, unjust enrichment, and unfair competition." <u>Id.</u>
at 7.

But here, Defendants are requesting the underlying "raw data" income
statements for the Jim Hawk Group branches that make up the aggregated
financial information used by Jim Hawk's expert to calculate lost profits.
Docket No. 176-1.  As Defendants correctly point out, "Plaintiff put the revenue
and profit history of all its branches at issue by producing aggregated income
statements for the entire company to its expert, and by its expert's reliance on
the information to calculate its alleged 'but for' lost revenue."  Docket No. 175,
p. 2.  Unlike Jim Hawk's previous request for "[a]ny and all bank statements,"
Defendant's request is relevant and not overbroad, as an evaluation of the
financial records of each of the Jim Hawk Group branches may reveal errors in
the aggregated data relied on by Jim Hawk's expert.

Jim Hawk also argues that because the income statements of each of
their branches was not provided to their expert, "there is no obligation under
the federal rules of discovery to produce documents that were not provided to
or relied upon by an expert."  Docket No. 141, p. 6.  In other words, Jim Hawk
argues, "[i]ncome statements from other branches that were not relied upon by
[Jim Hawk's] expert do not evidence or establish [Jim Hawk's] damages claim."
Docket No. 141, p. 3.  This argument is unpersuasive.

Under FED. R. CIV. P. 26(a)(2)(B), the expert must provide "the facts or
data considered by the witness in forming [their opinion]," and "any exhibits
that will be used to summarize or support [their opinion]."  While the specific

income statements from all Jim Hawk branches may have not been produced to their expert, Jim Hawk did provide aggregated income statements of all of Jim Hawk's branch offices, which were relied on by their expert.  <u>See</u> Docket No. 176-1.  Inherent in this aggregated data are the specific income statements for all Jim Hawk branches.

Rule 26(b) "is widely recognized as a discovery rule which is liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence."  <u>Hofer</u>, 981 F.2d at 380 (citing <u>Kramer v. Boeing Co.</u>, 126 F.R.D. 690, 692 (D.Minn. 1989)).  Jim Hawk cannot simply use FED. R. CIV. P. 26(a) as an end run to producing financial information that is relevant to Defendant's defense against Jim Hawk's lost profit claims, which was put at issue by Jim Hawk in its expert report.

In that same vein, Jim Hawk asserts Defendant's reliance on <u>Kayongo-Male</u> and <u>Kooima</u> are misplaced, as those cases "required the production of data provided to the experts, not information beyond what was provided to the experts."  Docket No. 141, pp. 5-6.  While this is accurate, it does not change the outcome.  Jim Hawk provided its expert aggregated financial data for all of Jim Hawk to be compared to income statements of its Sioux Falls branch. Docket No. 176.  This action by Jim Hawk and its expert placed the income statements of all of Jim Hawk's branches at issue.  Therefore, this court finds it necessary for Jim Hawk to produce this financial data to Defendants.

Next, Jim Hawk rejects Defendant's reliance on Ag Spectrum Co., asserting "the company in that case had previously only provided summary [financial] documents," and Jim Hawk has produced all the financial information for its Sioux Falls branch, a separate legal entity from the other Jim Hawk branches.  While Jim Hawk may have produced the relevant Sioux Falls branch financial information, they have produced no income statements for the branches that make up the Jim Hawk Group aggregate data in the expert's report.  See Docket No. 176-1.  These aggregated income statements were used by Jim Hawk's expert to compare the percent change in net income between the Sioux Falls branch and the rest of Jim Hawk Group from 2016 to 2021.  Id.

The court in Ag Spectrum Co. stated that "the production of summaries of financial information drawn from underlying source documents may be inadequate without disclosure of the source documents themselves, to enable an opponent to analyze the source information on its own."  2015 WL 11117312, at *2.  Without the disclosure of the source data within the Jim Hawk Group aggregate income in the expert's report (the income statements of all Jim Hawk Group branches), Defendants will be unable to adequately defend themselves against Jim Hawk's claim of lost profits.

Jim Hawk also rejects Defendant's reliance on Marvin Lumber & Cedar Co. v. Norton Co. and Fields v. Gen. Motor Corp.  From this court's view, Defendants only relied on Marvin Lumber for a general assertion of law, not a factual comparison.  See Docket No. 117, p. 6.  This assertion, "that a

defendant is entitled to discovery of its adversary's theory or measure of damages, its calculations under that theory, and expert opinions on the subject of damages," is supported by FED. R. CIV. P. 26 and has been upheld several times by district courts within our circuit.  Marvin Lumber, 113 F.R.D. at 593 (citing Kodekey Electronics, Inc. v. Mechanex Corp., 486 F.2d 449, 458 n. 10 (10th Cir. 1973)); see, e.g., Henne, 2021 WL 6804560, at *18; Marco Technologies, LLC v. Midkiff, No. 19-cv-2323 (PJS/LIB), 2020 WL 13558312, at *12 (D. Minn. June 4, 2020); Gacek v. Owens & Minor Distrib., Inc., Civ. No. 09-3202 (PAM/LIB), 2010 WL 11534503, at *3 (D. Minn. Oct. 21, 2010).  The court agrees with Jim Hawk's assertion that this case is factually distinguishable, but that is beside the point.  The statement cited by Defendants from Marvin Lumber remains legally sound.

Conversely, Defendants cited Fields to further their argument that the income statements of all Jim Hawk branches should be compelled, rather than citing it for a general assertion of law.  See Docket No. 117, p. 6.  Jim Hawk argues this case is distinguishable because it involves different underlying claims and "because there is no claim that the track record of other [Jim Hawk] locations is relevant to the claims and defenses in this litigation."  Docket No. 141, p. 5.  The court disagrees.  While Fields does not deal with claims of misappropriation of trade secrets, this is again beside the point.

In addressing a motion to compel all financial documents (income statements included) of a car dealership, the Fields court determined that "Defendant GM will be allowed to inquire into the financial status of plaintiffs'

past and present" car dealerships, as it would be relevant to a claim of damages for lost profits.  Fields v. Gen. Motor Corp., No. 94 C 4066, 1996 WL 14040, at *5-6 (N.D. Ill. Jan. 14, 1996).  Because Jim Hawk placed the "track record" of all their branches at issue once they provided aggregated income statements to their expert, company-wide income statements are relevant to Defendant's defense against a claim of lost profits.

Jim Hawk cites Willis Elec. Co. v. Polygroup Trading Ltd., asserting company-wide financial information should not be compelled, as it is "not relevant or proportional to the claims even where the defendants argue the information was needed to assess lost profit claims."  Docket No. 141, p. 5. Jim Hawk is correct in that the Willis Elec. Co. court denied a motion to compel "company-wide financial statements."  Willis Elec. Co. v. Polygroup Trading Ltd., No. 15-CV-3443-WMW-Kmm, 2021 WL 568454, at *10 (D. Minn. Feb. 16, 2021).  But this case is distinguishable.

In a footnote, the Willis Elec. Co. court noted that "there [was] no indication that the targeted cost information allegedly missing from the expert's analysis could be found in [the financial] statements."  Id. at *15, n. 14.  But here, there is an indication of missing financial data within Jim Hawk's expert report—what facts, data, and financial information make up the aggregated financial sums relied on by Jim Hawk's expert.  Unlike the financial information in Willis Elec. Co., the income statements Defendants seek are not "tangential at best."  Id. at *10.  The moment Jim Hawk and their expert sought to compare the income statements of their Sioux Falls branch to the

23

income of their entire company, the income statements of all their individual branches became relevant.

Jim Hawk argues that this request is "overly broad, unduly burdensome and not proportional to the needs of the case," as the documents sought are not limited to the only location at issue, the Jim Hawk Sioux Falls branch. Docket No. 141, p. 4. "The party resisting discovery must show specifically how each interrogatory or request for production is not relevant or how each question is overly broad, burdensome or oppressive." Nye v. Hartford Acc. & Indem. Co., No. CIV. 12-5028-JLV, 2013 WL 3107492, at *8 (D.S.D. June 18, 2013) (citing St. Paul Reins. Co., Ltd. v. Commercial Fin. Corp., 198 F.R.D. 508, 512 (N.D. Iowa 2000)). As discussed above, the court finds that the income statements for all the Jim Hawk branches are relevant, proportional to the needs of this case, and not overly broad.

As to whether this discovery request is burdensome, Jim Hawk has not shown with specificity how producing the income statements for all their branches would be burdensome. Merely stating that it would be burdensome for Jim Hawk to produce this financial data amounts to a boilerplate objection. "This district has repeatedly held that boilerplate objections fail to pass muster." Rounds v. Hartford, 4:20-CV-04010-KES, 2021 WL 4150838, at *9 (D.S.D. Sept. 13, 2021); Kooima v. Zacklift Int'l. Inc., 209 F.R.D. 444, 446 (D.S.D. 2002); Schultz v. Sentinel Ins. Co., No. 4:15-CV-04160-LLP, 2016 WL 3149686, at *7 (D.S.D. Jun. 3, 2016). Thus, the court finds disclosure of the income statements would not be "unduly burdensome." Presumably, if Jim

Hawk were able to compile the aggregated income of all of Jim Hawk to provide to their expert and Defendants, they can provide the underlying source documents of that aggregated amount without significant additional expenditure of time and expense.

Defendant's request for the production of income statements from 2016 to 2021 for all the locations that comprise the Jim Hawk Group is granted. Within 15 days, Jim Hawk shall provide the income statements for these locations: Council Bluffs, Iowa; Davenport, Iowa; Sioux City, Iowa; Des Moines, Iowa; Chicago, Illinois; Morton, Illinois; East Peoria, Illinois; Kansas City, Missouri; Gretna, Nebraska; and Denver, Colorado. In the alternative, Jim Hawk will not be compelled to produce these records if their current expert report is withdrawn and replaced with a new one that analyzes only the profits of Jim Hawk's Sioux Falls branch, without a comparison to general aggregated company income statements. Without a withdrawal of Jim Hawk's current expert report, the discovery sought must be provided.

### 3.    Scholten's Request for Production of Documents

Scholten requests that the court compel Jim Hawk to "produce documents related to his commission agreement and payments." Docket No. 117, p. 10. It appears Jim Hawk has produced relevant documents, but many have been designated as Attorneys' Eyes Only ("AEO"). Thus, the only question before the court is whether the AEO designation should be removed from the relevant documents produced by Jim Hawk as to Scholten's requests for production. See Docket No. 117, p. 11.

Defendants argue the AEO designations should be removed because they "prevent Scholten from conferring with his attorneys and reviewing evidence that he needs to prosecute this claim," and the information is necessary to determine Scholten's unpaid commission.  Id.  Jim Hawk rejects this, arguing the documents produced contain "confidential and sensitive financial information" that Jim Hawk believes would give Defendants, a direct competitor of Jim Hawk, an unfair competitive advantage.  Docket No. 141, p. 11.  Jim Hawk asserts that these documents contain information on Jim Hawk's "revenue, costs, net income, profitability, and expenses."  Id.

The court in Cup O' Dirt LLC v. Badlands Airtime, LLC, discussed the proper application of AEO:

> While limiting disclosure on an "attorneys' eyes only" basis is recognized as an appropriate method of protecting information in very limited situations, e.g. cases involving trade secrets, e.g., In re City of New York, 607 F.3d 923, 935-36 (2d Cir. 2010) (attorneys' eyes only disclosure is a "routine feature of civil litigation involving trade secrets"), it is a drastic remedy given its impact on the party entitled to the information. For one thing, it limits the ability of the receiving party to view the relevant evidence, fully discuss it with counsel, and make intelligent litigation decisions. E.g., Dorchen/Martin Assoc., Inc. v. Brook of Cheboygan, 2012 WL 1936415, at *1 (E.D. Mich. May 29, 2012).  Also, in many cases, it limits the ability of a party to provide needed assistance to counsel. E.g., MGP Ingredients, Inc. v. Mars, Inc., 245 F.R.D. 497, 500-02 (D. Kan. 2007); Medtronic Sofamor Danek, Inc. v. Michelson, 2002 WL 33003691, at *2-4 (W.D. Tenn. Jan. 30, 2002); Frees, Inc. v. McMillian, 2007 WL 184889, at *5 (W.D. La. Jan. 22, 2007).
>
> For these reasons, any designation of material as "attorneys' eyes only" should be reserved for only those rare instances in which it is truly justified, i.e, when there is a real expectation and entitlement to confidentiality under the law that has been preserved and not waived and there is no other effective alternative.  Burris v. Versa Products, Inc., 2013 WL 608742, at *2 (D. Minn. Feb. 19, 2013) (strict criteria for "attorneys' eyes only" disclosure not met); EQ Oklahoma, Inc. v. A Clean Environment Co., 2012 WL 5429869, at *2 (N.D. Okla. Nov. 7,

2012) (same); <u>Scentsy, Inc. v. B.R. Chase, L.L.C.</u>, 2012 WL 4523112, at *4-6 (D. Idaho Oct. 2, 2012) (same); <u>Brandt Industries, Ltd. V. Pitonyak Machinery Corp.</u>, 2012 WL 3704956, at **2-3 (S.D. Ind. Aug. 27, 2012) (same).  In other words, it should not be authorized simply because one of the parties would prefer that certain information not be disclosed to an opposing party.  <u>See</u> <u>id.</u>

<u>Cup O' Dirt LLC v. Badlands Airtime, LLC</u>, 4:19-CV-04031-KES, 2021 WL 680173, at *13-14 (D.S.D. Feb. 22, 2021) (quoting <u>Ragland v. Blue Cross Blue Shield of North Dakota</u>, No. 1:12-cv-080, 2013 WL 3776495, at *1-2 (D.N.D. June 25, 2013)).

In <u>Ag Spectrum Co.</u>, the court determined that "profit and loss statements and balance sheets" should be produced with the designation of "Attorney and Financial Expert Witness Eyes Only."  <u>Ag Spectrum Co.</u>, 2015 WL 11117312, at *2.  Similarly, in <u>White Cap Const. Supply, Inc. v. Tighton Fastener and Supply Corp.</u>, the court held that "profit, sales and customer information" should be produced under an attorneys' eyes only designation because the parties were direct competitors and the information would provide a competitive advantage.  <u>White Cap Const. Supply, Inc. v. Tighton Fastener and Supply Corp.</u>, No. 8:08CV264, 2009 WL 3836891, at *2 (D. Neb. Nov. 13, 2009).

This case involves allegations of trade secret misappropriations between direct competitors and the documents at issue are general ledger income statements.  While an AEO designation is a "drastic remedy," it is reasonable to assume that providing income statements and financial information to a direct competitor could give Defendants an unfair competitive advantage outside of this litigation.  In fact, Defendants seemingly concede that Jim Hawk's

27

financial information should be designated as AEO.  See Docket Nos. 117, p. 28 & 175, p. 26.  Within the parties' stipulated protection order, a "Confidential – Attorneys' Eyes Only" designation can be given to non-public materials containing information related to "financial or tax data" or "financial results."  Docket No. 72, pp. 2-3.  An AEO designation does not prevent Defendant's counsel, independent non-party experts, consultants, and investigators from viewing these income statements in order seek the information Defendants want—an accurate calculation of Scholten's unpaid commission.  Id.  The court finds that an AEO designation is proper and should remain on the responsive documents provided for Scholten's request for production.

### 4.    Sneve's Interrogatory No. 1

Defendants request that the court compel a supplemental answer which: (1) identifies the amount of the insurance payment that impacted Sneve's commission; (2) a description of how the pro rata share of the insurance payment was applied to Sneve and how his 2019 fourth quarter commission was calculated; (3) details on Jim Hawk's net income figures used to calculate Sneve's commission prior to 2020; and (4) any business records, by Bates stamps, which are relevant to this interrogatory, without an AEO designation. Docket No. 117, p. 13.

Sneve's Interrogatory No. 1 requested Jim Hawk:

Identify, with specificity, each component and any applicable terms of Defendant Sneve's compensation as Service Manager at [Jim Hawk], including hourly wage or salary, vacation or paid time off benefits, and

any commission or bonus compensation and the method [Jim Hawk}
used to calculate the commission or bonus payments.

Docket No. 118-7.  Jim Hawk first objected to this request because terms used

in the request were vague and ambiguous and the request was overly broad,

unduly burdensome, and not proportional to the needs of the case.  Id.  Jim

Hawk "refer[red] to documents it will produce that will sufficiently demonstrate

Sneve's commission payments for 2019 and 2020."  Id.

Jim Hawk has since provided two supplemental responses, which

included details on Sneve's salary, commission rate, when commissions were

paid, and a discussion on pro rata payments for Property and Casualty

insurance.  Id.  Defendants assert these responses are deficient because they

do not contain details on how these insurance payments "affected Sneve's

commission in 2019, including the amount of the payment, what the insurance

payment was for, and how it was pro-rated to [Jim Hawk's] service

department."  Docket No. 175, p. 11.  The court agrees.

Sneve's Interrogatory No. 1 requests "each component … of Defendant

Sneve's compensation."  Docket No. 118-7.  A pro rata payment for insurance

is certainly a factor that would affect Sneve's overall compensation.  In fact,

during Jim Hawk's corporate deposition, James Hawk explained that the

insurance cost came at the end of 2019, which "wiped out the potential profit"

for the service department, which resulted in him not receiving a commission.

Docket No. 155-6, p. 4.  Thus, data related to the exact amounts of the

insurance payments attributed to Sneve and how it was pro-rated to Jim

Hawk's service department would be relevant to Sneve's claims for unpaid commissions.

Jim Hawk argues that Interrogatory No. 1 does not include a request for information on how the insurance payment was calculated and they have already given Defendants information on why Sneve did not receive a commission.  Docket No. 141, p. 12.  But this is not the first time Defendants have requested this information.  In a February 9, 2022, correspondence, Defendants notified Jim Hawk that their response to Sneve's Interrogatory No. 1 was incomplete, as it did not contain an explanation of "the precise amount of both Sneve's fourth quarter 2019 commission payment and the precise amount of the [Property and Casualty Insurance] deduction."  Docket No. 118-13, p. 1.   While Jim Hawk may have provided Defendants with documents showing a net loss to the service department, these documents do not explain what the exact amount of the insurance payment was and how it was pro-rated to Jim Hawk's service department.  Docket No. 118-18.

Sneve was paid a commission based on a percentage of the net income of the service department.  Docket No. 118-7.  Thus, any information on how insurance payments affected the net income of the service department would be relevant to his unpaid commission claims.  Defendants' motion to compel as to Sneve's Interrogatory No. 1 is granted.

### 5.    Sneve's Interrogatory No. 2

Defendants request that the court compel Jim Hawk to disclose the gross sales of the service department from January 1, 2020, to March 31, 2020, and

"any applicable adjustments, used to calculate Defendant Sneve's compensation, including any commission or bonus payment."  Docket No. 117, p. 14.  Jim Hawk argues they have already "provided a supplemental response identifying Bates numbers that contained the relevant documentation."  Docket No. 141, p. 13; see also Docket No. 118-7.  Defendants now claim that many documents referenced by Jim Hawk contain irrelevant materials.  Docket Nos. 117 & 175.

Jim Hawk states that it "would have gladly conducted this review prior to the Motion being filed" if they were given notice of the deficiencies and irrelevant documents produced in their supplemental responses.  Docket No. 141, p. 13.  In other words, Jim Hawk again asserts Defendants did not meet their obligations to meet and confer on this issue before filing the motion to compel.  As addressed above, the court is not persuaded by Jim Hawk's argument.  See, supra, Section B(1)(b).

The parties argue at length whether the documents provided in Jim Hawk's supplemental responses to Sneve's Interrogatory No. 2 were relevant or irrelevant.  Defendants claim that nearly all the "608 pages of documents" Jim Hawk provided were not responsive to the interrogatory, and the few relevant documents are designated as AEO.  Docket No. 175, p. 12.  Jim Hawk concedes "that the range [of documents] inadvertently included documents that were not responsive to the request," but that some documents referenced were relevant.  Docket No. 141, p. 13.  Jim Hawk also concedes that it "inadvertently

31

failed to include" an additional Bates ranges of documents that were relevant to the request.  Id.

"Rule 33(d) gives a party the option to produce business records in lieu of a detailed Interrogatory Answer."  Speed RMG Partners, LLC v. Arctic Cat Sales Inc., No. 20-cv-609 (NEB/LIB), 2021 WL 5087362, at *5 (D. Minn. Jan. 5, 2021).  "Invocation of Rule 33(d) 'requires first that the information actually be obtainable from the documents.' "  Id. at *6 (quoting Schwendimann v. Arkwright Advanced Coating, Inc., No. 11-820 (ADM/JSM), 2015 WL 12781248, at *5 (D. Minn. Oct. 14, 2015)).  "In addition, simply referring the interrogating party generally to large numbers of documents does not satisfy a party's obligations under Rule 33(d)."  Id.  By Jim Hawk's own concession of including ranges of non-responsive documents and inadvertently failing to include separate relevant documents, Jim Hawk has failed to satisfy their discovery obligations under Rule 33(d).

Information on the gross sales for Jim Hawk's Service Department is highly relevant to Sneve's claims of unpaid commissions, as his monthly commissions were based on the revenue of the service department.  Again, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim."  FED. R. CIV. P. 26(b)(1).  Because of the longstanding issues between the parties on the documents being produced as to this interrogatory, the court compels Jim Hawk to provide three numbers to Defendants—the specific monthly net income for Jim Hawk's service department for January, February, and March 2020.  The court also compels

Jim Hawk provide the monthly income statement for the service department for February 2020.  But, as this court held in Section B(3), *supra*, this documentation may be designated as AEO, as it would contain sensitive financial information.

### 6.    Sneve's Interrogatory No. 3

Defendants request that the court compel Jim Hawk to "explain the reason that Plaintiff refused to pay Defendant Sneve's final commission payment."  Docket No. 117, p. 16.  Jim Hawk asserts they have already provided an accurate answer to this interrogatory: "Sneve was not entitled to any additional commissions" or compensation.  Docket No. 141, p. 14; Docket No. 118-7, p. 3.  Defendants argue this response is "evasive and non-responsive" and request that Jim Hawk "provide direct, narrative interrogatory answers that explain why it did not pay [Sneve] the commission they had earned."  Docket No. 175, p. 17.  The court disagrees.

There is no requirement in FED. R. CIV. P. 33 that a party must respond to an interrogatory with a "narrative" answer—only that the question has been answered "fully."  See FED. R. CIV. P. 33(b)(3).  "[I]nterrgatories are intended to be a relatively inexpensive discovery method used to obtain sworn answers from an opposing party."  Sprint Comms. Co. L.P. v. Crow Creek Sioux Tribal Court, 316 F.R.D. 254, 273 (D.S.D. Feb. 26, 2016) (citing 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, § 2163 (3d. ed)).  Sneve's Interrogatory No. 3 simply asked for an explanation on why Sneve did not receive a final commission payment.  Jim Hawk's response stating that

Sneve was not entitled to any additional commission or compensation sufficiently answers that question.

Whether Defendants have factual disagreements with the response given by Jim Hawk is irrelevant for purposes of this motion to compel.  The "narrative" explanation that Defendants seek would have been more appropriate during the deposition of Jim Hawk's corporate representative.  See Docket No. 155-6.  In this deposition, Jim Hawk's corporate representative gave details on how commissions were calculated, the timing of when commissions were paid, and some details on why the individual Defendants were not entitled to commissions.  Id.

Defendants also argue they are entitled to an explanation because Jim Hawk's "own summary of Sneve's commission payments indicated that it had calculated amounts owed to him in February and March 2020."  Docket No. 117, p. 16; see also Docket No. 118-18.  But, again, this assertion raises a factual dispute rather than a discovery dispute.  Sneve's Interrogatory No. 3 asks for an explanation on why he was not paid a commission payment.  Jim Hawk provided an adequate response indicating he was not entitled to any additional compensation.  Thus, Defendants' motion to compel as to Sneve's Interrogatory No. 3 is denied.

### 7.    Sneve's Requests for Production of Documents

Defendants request that the court compel Jim Hawk provide additional documentation related to Sneve's commission agreement and payments. Docket No. 117, p. 16.  Defendants assert Jim Hawk's responses "arbitrarily

34

limit[] responsive information to 2019 and 2020" and "has not produced any
documents that reflects the lump sum insurance payment that JHTT claims
allegedly impacted the calculation of Sneve's commission."  Id.  Jim Hawk
argues that documentation beyond 2019 and 2020 is "overly broad" and that it
has already provided documents explaining Sneve's commission payments and
an explanation for withholding the insurance payment during depositions.
Docket No. 141, p. 15.

To begin, this court previously compelled Jim Hawk provide additional
responses to Sneve's Interrogatory No. 1 to include information on the amount
of the Property and Casualty insurance premium that affected the net income
of Jim Hawk's service department and Sneve's commission payments.  See,
supra, Section B(4).  The court finds that documents related to the exact
amounts of the insurance payments attributed to Sneve and how it was pro-
rated to Jim Hawk's service department would be relevant to Sneve's claims for
unpaid commissions.

To clarify, Jim Hawk in its supplemental responses did provide details on
Sneve's salary, commission rate, when commissions were paid, and a
discussion on pro rata payments for Property and Casualty insurance.  Docket
No. 118-7.  However, these responses do not include the amount of the
insurance payment and how it was allocated to Jim Hawk's service
department.  Jim Hawk also provided documents showing that the insurance
costs resulted in a loss to the service department, but, again, these documents

do not provide information on the exact cost of the insurance.  <u>See</u> Docket No. 118-18.

Jim Hawk finally argues that "Sneve has had the opportunity to explore this issue during" the depositions of Jim Hawk's former and current CFOs, Ryan Burke, and Diana Thorston.  Docket No. 141, p. 15.  But neither Mr. Burke nor Ms. Thorston provided information on the amount of the insurance payment that affected Sneve's commission.  <u>See</u> Docket Nos. 155-7 & 155-8.  Thus, Defendants' motion to compel as to Sneve's request for production of documents detailing the insurance payment Jim Hawk allocated to its service department is granted.

### 8.    Jensen, Thompson, and Falor's Interrogatory No. 1, and Falor's Interrogatory No. 2

Interrogatory No. 1 for Jensen, Thompson, and Falor seeks details on the components and terms of their compensation, including details on their commissions and how those commissions were calculated.  Docket No. 117, p. 17.  Interrogatory No. 2 for Falor seeks details on the "total gross sales and profits attributed to" Falor from January 1, 2020, to March 31, 2020.  <u>Id.</u> at 18. Jim Hawk asserts they have properly responded to these interrogatories by providing relevant documents.  Docket No. 141, p. 16; <u>see also</u> Docket Nos. 118-8, 118-9, 118-10.

In their response, Jim Hawk concedes that it had "reviewed its records and realized that it inadvertently included some documents that were not directly relevant to the Interrogatory as part of its prior response," but that some relevant documents were provided.  Docket No. 141, p. 16.  Jim Hawk

also provided more specific details on which documents were relevant to the interrogatories within the Bates range they initially provided.  Id.  Jim Hawk argues that "any confusion caused by the inadvertent inclusion of Bates numbers could have been cleared up if Defendants' counsel has simply picked up the phone or sent an email."  Id.  The court disagrees.

"To answer an interrogatory, a responding party has a duty to specify, by category and location, the records from which answers to interrogatories can be derived."  Speed RMG Partners, LLC, 2021 WL 5087362, at *5 (quoting Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., No. 9-cv-1091 (JNE/JSM), 2012 WL 12894846, at *10 (D. Minn. May 11, 2012).  "[S]imply referring the interrogating party generally to large numbers of documents does not satisfy a party's obligations under Rule 33(d)."  Id. (quoting Schwendimann, 2015 WL 12781248, at *5)).  By Jim Hawk's own concession, Jim Hawk provided a large Bates range which included irrelevant documents.  Docket No. 141, p. 16.  It was only after Jim Hawk provided specifics within their response to this motion that Defendants were able to locate documents relevant to their interrogatories.  Jim Hawk's response was improper under FED. R. CIV. P. 33(d).

But, with the specific details now provided by Jim Hawk, Defendants have suggested that many of the issues they had with Jim Hawk's responses have been alleviated.  See Docket No. 175, pp. 17-20.  From this courts view, the only remaining issues with these interrogatories are: (1) whether the AEO designation on the documents provided should be changed to a "confidential" designation, (2) whether an explanation of how Jim Hawk set Thompson and

Jensen's commission quotas and goals should be compelled, (3) whether further explanation of the terms and components of Thompson and Jensen's commission plans should be compelled, (4) whether the Parts Department income statement for February 2020 should be compelled, and (5) whether Defendants should be awarded attorneys' fees and costs due to Jim Hawk's "burdensome discovery tactics." As a preliminary matter, whether attorneys' fees and costs will be awarded to the Defendants is addressed below. See *infra* Section B(12).

As to issue (1), the court finds the documents should be re-designated as Confidential, not AEO. Under the parties' stipulated protection order, "the witness or Party making the designation shall have the burden of proof that the challenged Discovery Material is entitled to the protection of the particular designation of 'Confidential' or 'Confidential – Attorneys' Eyes Only' within the scope of protection afforded by Fed. R. Civ. P. 26(c)." Docket No. 72. Again, an AEO designation "should be reserved for only those rare instances in which it is truly justified, i.e., when there is a real expectation and entitlement to confidentiality under the law that has been preserved and not waived and there is no other effective alternative." Cup O' Dirt LLC, 2021 WL 680173, at *13 (quoting Ragland, 2013 WL 3776495, at *1-2)). "In Ragland, the court did not approve the inclusion of an AEO designation . . . because the movant had failed to identify specific information that would meet the 'very strict criteria' for AEO protection." Id.

38

Jim Hawk makes no argument that the documents provided in response to Jensen, Thompson, and Falor's interrogatory no. 1 and Falor's interrogatory no. 2 should have the AEO designation.  See Docket No. 141, pp. 16-17. Without such argument, Jim Hawk has failed to meet its burden of proof and the documents will be re-designated as Confidential.  These documents will include: JHTT-Crossroads 002206-002208, 000865-000926, 002428, 000799-000864, 001392-001397, 002206-002207, 002428, 000927-000983, 001398-001403.

As to issue (2), Defendants request that the court compel Jim Hawk to explain how Jim Hawk sets Thompson and Jensen's commission quotas and goals contained within the provided discovery.  Docket No. 175, p. 18; see also Docket No. 155-9.  Jim Hawk claims this information was provided in JHTT-Crossroads 002206-002208, as well as their past responses.  Docket No. 141, p. 16.

JHTT-Crossroads 002206-002208 sets forth what data was used to calculate Thompson and Jensen's commission quota and goals.  Docket No. 155-9.  Jim Hawk also provided information on how Jensen and Thompson could earn commissions based on the quotas, what the percentages were, and how they would apply.  See Docket Nos. 118-9 & 118-10.  Jim Hawk also provided JHTT-Crossroads 002428, which shows gross sales, gross margin, and cost of goods sold attributed to Jensen and Thompson.  Docket No. 176-11.

The court believes these responses are sufficient to answer Defendants'
interrogatory requesting "each component and any applicable terms" of Jensen
and Thompson's compensation.  Defendants' request for more information on
"how the company ascertains and calculates the gross margin for Thompson
and Jensen's sales" is beyond the scope of this interrogatory.  See Docket No.
117, p. 21.

As to issue (3), Defendants assert the documents specified by Jim Hawk
are not responsive to Thompson and Jensen's interrogatory no. 1 as they do
not "identify or describe the terms and components of [Thompson and
Jensen's] commission plans.  Docket No. 175, p. 20.  Jim Hawk claims this
information was provided in JHTT-Crossroads 000799-000864, 001392-
001397, 002206-002207, 002428, 000927-000983, 001398-001403.[2]  Docket
No. 141, p. 16.  JHTT-Crossroads 000799-000864 shows itemized pay
summaries for Jensen from February 2019 until March 2020, including details
on commission payment amounts.  See Docket No. 179-1, pp. 1-41.  These
documents also provide detailed summaries of the sales attributed to Jensen
and calculations of his commission payments.  Id. at 42-66.  JHTT-Crossroads
002428 shows gross sales, gross margin, and cost of goods sold attributed to
Jensen and Thompson, and JHTT-Crossroads 002206-002208 shows data on
Jensen and Thompson's total sales and their commission goals and quotas.
Docket No. 176-11; Docket No. 155-9.

---

[2] JHTT-Crossroads 001392-001397 and 001398-001403 provide sales
summaries for Ryan Wendling and Jim Murphy.  See Docket Nos. 179-2 &
179-6.

JHTT-Crossroads 000927-000983 shows itemized pay summaries for Thompson from January 2019 to March 2020, including details on commission payment amounts.  See Docket No. 179-3.  These documents also show details on the sales attributed to Thompson and calculation of her commission payments.  See Docket No. 179-4.  Additionally, Jim Hawk's prior responses provided details on Jensen and Thompson's salary and commission percentages.  See Docket Nos. 118-9 & 118-10.  The court believes these documents and prior responses sufficiently address Defendants' request for details on the terms and components of Jensen and Thompson's compensation.

As to issue (4), Defendants assert Jim Hawk has not completely responded to Falor's interrogatory No. 2 because it has not produced the monthly parts department income statement for February 2020.  Docket No. 175, p. 19.  Jim Hawk points to JHTT-Crossroads 000865-000926, 002428.  Docket No. 141, p. 16.  JHTT-Crossroads 002428 specifies that in February 2020, the net income of the parts department was $36,647.35.  Docket No. 176-11.

But Falor's Interrogatory No. 2 requested the "total gross sales and profits attributed to" Falor.  Defendants indicate that JHTT-Crossroads 00899-00926 appear to be monthly income statements for the parts department, excluding the income statement from February 2020.  Docket No. 175, p. 19.  JHTT-Crossroads 000865-000926 first shows itemized pay summaries for Falor from January 2019 to March 2020, including details on commission

41

payments.  <u>See</u> Docket No. 180-1, pp. 1-34.  Next, these documents show itemized income statements for the parts department, but it does not include a February 2020 statement.  <u>See</u> Docket No. 180-1, pp. 35-62.  The court compels Jim Hawk to provide the February 2020 income statement for the parts department.

### 9.    Thompson, Jensen, and Falor's Interrogatory No. 3

Defendants request that the court compel Jim Hawk to explain why Thompson, Jensen, and Falor did not receive their commission payments. Docket No. 117, pp. 21-22.  Jim Hawk asserts they "responded accurately that the Defendants were not entitled to any additional compensation."  Docket No. 141, p. 17.  For the same reasons provided in Section B(6), *supra*, the court denies Defendants' motion to compel as to Thompson, Jensen, and Falor's Interrogatory No. 3.

### 10.    Motion to Compel Electronically Stored Information ("ESI")

Defendants request that the court compel Jim Hawk to provide additional electronic discovery.  Docket No. 117, p. 22.  Defendants request Jim Hawk: (1) collect, review, and produce text messages from Jim Hawk's custodians, including Jim Hawk, Dave Hawk, Clint Carter, Tim Big Eagle, Curt Westphal, Dan Buckley, Bill Forsling, and Ryan Burke; (2) provide an explanation as to "why it does not have any email or other ESI attributable to Burke within its custody and control"; and (3) review and provide discovery on additional ESI search terms.  <u>See</u> Docket No. 175, pp. 20-26.  Jim Hawk argues Defendants have not met and conferred on these issues, they have

already provided the relevant information, and some of the requested information is not reasonably accessible.  See Docket No. 141, pp. 17-26.  As a preliminary matter, the court finds that Defendants sufficiently met their obligations to meet-and-confer on issues of ESI through many correspondences between the parties.  See Docket Nos. 118-3, 118-24, 118-25, 118-26, 118-27, 118-28, 118-29, 118-30, 118-31, 155-10.

### a.    Standard for ESI Discovery

The scope and limits of ESI discovery are governed by FED. R. CIV. P. 26(b).  Jim Hawk "need not provide discovery of [ESI] from sources that the party identifies as not reasonably accessible because of undue burden or cost." FED. R. CIV. P. 26(b)(2)(B).  "Reasonable accessibility is best understood in terms of whether the ESI 'is kept in an accessible or inaccessible format (a distinction that corresponds closely to the expense of production).' " Best Buy Stores, L.P. v. Developers Diversified Realty Corp., 247 F.R.D. 567, 570 (D. Minn. Nov. 29, 2007) (quoting Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 318 (S.D.N.Y. 2003)).  Jim Hawk has the burden to show that Defendants' ESI requests are not "reasonably accessible."  FED. R. CIV. P. 26(b)(2)(B).

But the court may nonetheless compel additional ESI discovery "if the requesting party shows good cause."  Id.  Courts consider seven factors to determine whether a showing of "good cause" has been made: "(1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more

easily accessed sources; (4) the likelihood of finding relevant responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of the further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources." Helmert v. Butterball, LLC, No. 4:08CV00342 JLH, 2010 WL 2179180, at *8 (E.D. Ark. May 27, 2010) (citing FED. R. CIV. P. 26(b)(2) advisory committee's notes (2006 Amendment)).  "[T]he decision whether to require a responding party to search for and produce information that is not reasonably accessible depends not only on the burdens and costs of doing so, but also on whether those burdens and costs can be justified in the circumstances of the case." Id.; see also Johnson v. Neiman, 4:09CV00689 AGF, 2010 WL 4065368, at *1 (E.D. MO. Oct. 18, 2010).

### b.    Whether Text Message ESI Should Be Compelled

Defendants request that the court compel Jim Hawk to "collect and review text messages from [Jim Hawk's] custodians," that concern the claims at issue.  Docket No. 175, p. 23.  Defendants assert these custodians include: Jim Hawk, Dave Hawk, Clint Carter, Tim Big Eagle, Curt Westphal, Dan Buckley, Bill Forsling, and Ryan Burke.  Id. at 24.  Jim Hawk argues these text messages are not relevant and asserts they have already produced considerable amounts of ESI.  Docket No. 141, pp. 23-24.  The court disagrees.

A review and collection of Jim Hawk employee text messages for messages related to the claims brought by Defendants is certainly relevant. The individuals that Defendants seek messages from are, or were, either

44

leaders or employees within Jim Hawk and review of these messages may provide Defendants with relevant discovery on their claims.  Jim Hawk has clarified they have reviewed and provided ESI from the cellphones of the Defendants, however, they have made clear they will not review their own employees' phones.  See Docket No. 118-31.  This is improper without a showing that the ESI is not "reasonably accessible."

Again, Jim Hawk "need not provide discovery of [ESI] from sources that the party identifies as not reasonably accessible because of undue burden or cost."  FED. R. CIV. P. 26(b)(2)(B).  Jim Hawk has made no such argument.  In response to Defendants' motion to compel, Jim Hawk indicated they have reviewed and provided considerable ESI data to Defendants and spent $42,065.61 in fees with its ESI vendor and approximately $84,387.50 in attorneys' fees.  Docket No. 141, p. 24.  While that may be true, this does not show how the review and production of text messages from Jim Hawk employees are not "reasonably accessible."

Jim Hawk has provided no insight as to how many documents Defendants' request will cumulate, how expensive this review will be, or how much time it will take to conduct this review.  Simply arguing that they have already provided considerable ESI and their own witnesses have testified that no text messages exist is irrelevant for purposes of ESI discovery.  Jim Hawk must show how Defendants' specific request for review and production of text messages from Jim Hawk company-owned cellphones is "not reasonably accessible because of undue burden or cost."  They have failed to do so.

45

Defendants have also shown "good cause" for requesting ESI on text messages.  As to the first factor, Defendants have made a specific request for review of Jim Hawk employee text messages that referred to "the Individual Defendants' unpaid commissions; discussions regarding the proposed sale of the Sioux Falls parts department and any employees' knowledge of the sale . . . any communications referencing Scholten's termination, Scholten's hiring at Crossroads, and the Individual Defendants' resignations; and any communications referencing the decision to close Plaintiff's Independent Part Distribution Center."  Docket No. 175, pp. 23-24.

The second factor favors Jim Hawk.  Jim Hawk asserts they have provided "a OneDrive file with 21,273 emails; the inboxes of 12 individuals totaling approximately 260,570 documents; data from the mobile phones of the Individual Defendants who possessed company-owned mobile phones totaling approximately 17,000 documents; and an additional 20 GB of data consisting of additional ESI."  Docket No. 141, p. 24.  It is reasonable to assume there is vast amounts of relevant information within this ESI data already produced.  As to the third factor, there is no argument of spoilage of ESI, thus this factor favors neither party.

Factors four and five favor the Defendants.  It is possible Jim Hawk will discover some text messages on their employee's cellphones that reference the Defendants' claims.  Any text messages from Jim Hawk employees referencing Defendants' claims would be important and useful for Defendants to support their claims against Jim Hawk.  As this court has previously held, factor six

would favor Jim Hawk, as this litigation is not a matter of public concern, and factor seven is irrelevant because neither party has shared with the court information on their resources.  <u>See</u> Docket No. 136, pp. 18-19.

"A court should not treat the 'good cause' factors as a checklist; rather, the factors should be weighed by importance."  <u>Johnson</u>, 2010 WL 4065368, at *2 (citing <u>Helmert</u>, 2010 WL 2179180, at *9).  Because Defendants have shown good cause for specifically requesting these relevant text messages and Jim Hawk has failed to show how providing this ESI is "not reasonably accessible because of undue burden or cost," Defendants' motion to compel as to review and production of Jim Hawk employee text messages is granted.  Jim Hawk shall collect, review, and produce text messages relevant to Defendants' claims from Jim Hawk, Dave Hawk, Clint Carter, Tim Big Eagle, Curt Westphal, Dan Buckley, Bill Forsling, and Ryan Burke's company-owned cellphones.

The court is sympathetic to the large costs associated with producing this ESI.  Defendants' request does not specify a date range by which Jim Hawk shall be conducting this review of text messages.  Without date restrictions, it is reasonable to assume the search of all these individuals text messages will produce large amounts of data.  Therefore, the court will *sua sponte* impose a date restriction: Jim Hawk shall review and produce Jim Hawk employee text messages between November 1, 2019, and June 1, 2020.

### c.    Whether Jim Hawk Should Be Compelled to Provide Additional Details on ESI

Defendants request that the court compel Jim Hawk to provide further explanation as to their own electronic discovery methods.  Docket No. 175,

pp. 24-25.  Defendants request Jim Hawk to: (1) "specifically disclose whether its October 2021 ESI collections that included Jim Hawk, Dave Hawk, Clint Cater, Tim Big Eagle, Curt Westphal, Dan Buckley, and Bill Forsling included the collection of the custodians' sent and deleted email folders and any calendar entries"; (2) "specify the date parameter and search terms it applied to reduce [their] ESI collection"; and (3) "explain why it does not have any email or other ESI attributable to Burke within its custody and control."  Id.

As to issue 1, it appears Jim Hawk has already answered Defendants as to whether the ESI provided included the custodians sent and deleted email folders and any calendar entries and appointment.  See Docket No. 118-31.  On March 11, 2022, Jim Hawk stated they had provided the email inboxes for the following individuals: Alvin Scholten, Bill Forsling, Clint Carter, Curt Westphal, Dave Hawk, David Jensen, Derek Falor, Jim Hawk, Mark Sneve, Michael Falor, Tim Big Eagle, and Tracy Thompson.  Docket No. 118-29, p. 2.  Within days, Defendants asked Jim Hawk to "confirm whether your reference to an individual's e-mail inbox also includes the individual's sent and deleted e-mail folders."  Docket No. 118-30, p. 1.  Shortly after, Jim Hawk confirmed "that its reference to an individual Defendant's inbox was meant to be inclusive of the inbox itself, as well as the sent and deleted items folders and any calendar entries and appointments."  Docket No. 118-31.

Defendants object to Jim Hawk's reference to only the "individual Defendant's inbox" instead of all twelve of the individuals previously mentioned.  But, as reflected in the March 11 correspondence, Jim Hawk

intended to provide all the email inboxes at issue.  Jim Hawk provided an explanation that the ESI contained both the sent and deleted items folders and any calendar entries and appointments.  Thus, it is reasonable to assume Jim Hawk also meant that within all the email inboxes they provided to Defendants, the ESI included the sent and deleted items folders and the calendar entries and appointments for all twelve individuals.  Therefore, Defendants' request for further explanation is denied.

As to issue 2, Defendants assert Jim Hawk "failed to identify the date parameters or searches that it applied to the large, pre-discovery ESI collection of 277,570 documents that it reduced to just 2,000 documents."  Docket No. 175, p. 24.  On March 28, 2022, Jim Hawk responded to Defendants' similar request stating:

> Jim Hawk narrowed this data using date filters to eliminate data outside of date parameters not relevant to the litigation. Jim Hawk then ran searches for emails between the individual defendants, searches for emails sent to or received from personal email addresses, and searches for key words like Crossroads, customer, list, and Alvin. Further, Jim Hawk ran a search for Terminat!, Fire! Firing, Resign!, Quit!, Retir!, Commission, Bonus, TruckPro (Truck /5 Pro), (sale sell) /10 "parts division", (sale sell) /10 "parts department" against all data from the Individual Defendants this resulted in 1,433 unique results with families. These documents are being reviewed and will be produced by March 30.

Docket No. 118-31, p. 2.  While Jim Hawk has provided the search terms it applied to reduce its ESI collection, it has not specified what the "date parameters" were.  Thus, the court compels Jim Hawk to simply provide the date range they used in reducing their ESI production.

As to request #3, the court denies Defendants' request for an explanation as to why Jim Hawk did not have any email or other ESI attributable to Burke within its custody or control.  This question would be more appropriate as a separate interrogatory or as a question during the deposition of Jim Hawk's corporate representative.

### d.   Whether Jim Hawk Should be Compelled to Review Additional Search Terms

Defendants request that the court compel Jim Hawk to produce documents responsive to the search terms "IPDC" and "Council Bluffs."  Docket No. 117, p. 27; Docket No. 175, pp. 25-26.  Jim Hawk argues ESI on these two search terms are not "reasonably accessible."  Docket No. 141, p. 25.

Again, Jim Hawk "need not provide discovery of [ESI] from sources that the party identifies as not reasonably accessible because of undue burden or cost."  FED. R. CIV. P. 26(b)(2)(B).  Jim Hawk asserts that the search terms "IPDC" and "Council Bluffs" returned over 11,000 documents, many of which were spam or irrelevant.  Docket No. 141, p. 25.  Jim Hawk estimates it will take around 183 hours to review these 11,000 documents, which could cost around $39,000.  Id. at 26.  Defendants do not dispute these numbers, but argue that if the results are mostly non-relevant spam, then Jim Hawk should be able to review these documents significantly faster.  Docket No. 175, pp. 25-26.  This argument is unpersuasive.

Jim Hawk has conducted extensive review of ESI in this case.  Specifically, Jim Hawk has reviewed "a OneDrive file with 21,273 emails; the inboxes of 12 individuals totaling approximately 260,570 documents; data from

the mobile phones of the Individual Defendants who possessed company-owned mobile phones totaling approximately 17,000 documents; and an additional 20 GB of data consisting of additional ESI." Docket No. 141, p. 24. Requiring Jim Hawk to review additional search terms which they have continuously claimed results in large amounts of spam or irrelevant data would be improper given the costs associated with such review.

Nonetheless, the court will compel this review if Defendants can show "good cause." FED. R. CIV. P. 26(b)(2)(B). As to the first factor, Defendants' request for additional review using the search terms "IPDC" and "Council Bluffs" is specific, thus, this factor favors Defendants. The second factor favors Jim Hawk, based on the extensive amounts of ESI discovery already provided to Defendants in this case. Factor three is irrelevant as there are no claims of spoilage of ESI data in this case.

Factors four and five also favor Jim Hawk. Jim Hawk asserts that many of the 11,000 documents that were collected using the search terms "IPDC" and "Council Bluffs" were spam, non-responsive, and not proportional to the needs of the case. Docket No. 141, p. 25. With this, it is unlikely that Defendants would be able to find relevant responsive information from this ESI review. In fact, Defendants have not provided any argument or evidence that review of these 11,000 documents will provide any new or relevant information. And, as addressed previously, factor six would favor Jim Hawk, as this litigation is not a matter of public concern, and factor seven is irrelevant

because neither party has shared with the court information on their resources.  See Docket No. 136, pp. 18-19; see, *supra*, Section B(10)(b).

Given the substantial expense required for Jim Hawk to review and produce ESI on "IPDC" and "Council Bluffs" and the low likelihood of this review turning up any relevant discovery, the court finds Defendants have failed to show "good cause" for the production of ESI that is not "reasonably accessible." FED. R. CIV. P. 26(b)(2)(B).  Thus, Defendants' motion to compel as to review of "IPDC" and "Council Bluffs" ESI is denied.

Defendants propose an alternative, requesting that the court compel Jim Hawk to only review and produce the search results for "IPDC," consisting of 2,803 documents.  Docket No. 175, p. 26.  But this alternative should have been proposed during one of the many meet-and-confer conferences the parties had, not for the first time within a motion to compel.  See Docket Nos. 118-29, 118-30, 118-31.  This request is similarly denied.

### 11.   Defendant's Motion to De-Designate AEO Materials

Defendants request that the court compel Jim Hawk "de-designate all information that has been previously designated as AEO," except for Jim Hawk's financial records.  Docket No. 117, p. 28.  This request includes Jim Hawk's expert reports, "customer lists, email communications, commission reports, sales reports, invoices, receipts, internal summaries and calculations, deposition testimony provided about the customers with whom Plaintiff claims Defendants wrongfully interfere[ed], and any other discovery."  Docket No. 175, p. 26.  Jim Hawk resists this, arguing that Defendants' request is overly broad,

and the documents Defendants seek to be de-designated were properly classified as AEO.  Docket No. 141, p. 27.  The court agrees.

Again, "any designation of material as 'attorneys' eyes only' should be reserved for only those rare instances in which it is truly justified, i.e, when there is a real expectation and entitlement to confidentiality under the law that has been preserved and not waived and there is no other effective alternative." Cup O' Dirt LLC, 2021 WL 680173, at *13-14 (citing Burris, 2013 WL 608742, at *2).  Without Defendants referencing specific documents they seek to be de-designated, it is difficult for the court to determine whether an AEO designation is justified.  Thus, the court will consider these requests generally.

First, commission reports, sales reports, invoices, receipts, and internal summaries and calculations are certainly "financial records," that Defendants have conceded can remain AEO.  Next, customer lists, email communications, and documents identifying Jim Hawk's confidential customer information are also properly designated as AEO.  See Consultus, LLC v. CPC Commodities, No. 19-00821-CV-W-FJG, 2020 WL 8513823, at *4 (W.D. Mo. Dec. 3, 2020) ("Courts often limit the disclosure of customer lists to attorneys.") (citing Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc., 235 F.R.D. 435, 445 (N.D. Ill. 2006)).  Again, this case involves allegations of trade secret misappropriation between direct competitors.  Providing this confidential customer information to a direct competitor could put Jim Hawk at a competitive disadvantage outside of this litigation.

However, while Jim Hawk's expert report contains financial information, the court believes it should be de-designated to Confidential, not AEO.  See Docket No. 118-1.  If this case were to go to trial, it is likely this expert report would be placed into evidence and the expert would testify.  If this were to happen, Defendants' would inevitably discover the sensitive financial information contained within this report since they have a right to be present during trial.  Due to this, the courts believes it would be pointless to prevent the Defendants from gaining access to this report at this point in the litigation. Thus, Defendants' motion to compel Jim Hawk to de-designate all documents other than financial records is denied, with the exception that Jim Hawk's expert report shall be de-designated to Confidential.

### 12.    Whether Defendants are Entitled to Attorneys' Fees

Defendants request that the court award attorneys' fees for bringing this motion to compel under Federal Rule of Civil Procedure 37(a)(5)(A-C).  Docket No. 117, p. 28.  The court orders Defendants to serve Jim Hawk within twenty-one (21) days of the date of this opinion a motion for attorneys' fees together with a detailed accounting of the time spent in preparing and defending this motion. Jim Hawk shall have twenty-one (21) days to respond in opposition thereto. Defendants may file a reply within fourteen (14) days.  If objections are lodged to this opinion, all litigation over attorneys' fees will be suspended until the outcome of such objections is known.  If objections are timely filed, Defendants shall hold in abeyance any motion for attorney's fees until the objections are resolved.

**C.     Plaintiff Jim Hawk's Motion to Compel Discovery**

     **1.     Has Jim Hawk Exhausted their Obligations to Meet and Confer under Fed. R. Civ. P. 37(a)(1)?**

Again, before a party may move for an order compelling discovery, "a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action" must be filed.  Fed. R. Civ. P. 37(a)(1).  "Good faith" requires that the parties made a genuine attempt to resolve the discovery dispute without involving the court.  Shuffle Master, Inc., 170 F.R.D. at 170-171.  "Conferment" requires the parties "to have had an actual meeting or conference."  Id.  Thus, before making a motion to compel, "a moving party must personally engage in two-way communication with the nonresponding party to meaningfully discuss each contested discovery dispute in a genuine effort to avoid judicial intervention."  Id.

Defendant first asserts that Jim Hawk failed to exhaust their obligations to meet and confer regarding requests for production nos. 65-76.[3]  Docket No. 145, p. 27.  For these requests, Jim Hawk argues they "invited a call if Crossroads believed the parties could resolve any of those issues [and] Crossroads responded by stating they stood on their objections."  Docket No. 177, p. 12.  Thus, Jim Hawk argues any further efforts to meet and confer on these issues would have been futile.  Id.

---

[3] Jim Hawk has indicated that request nos. 65-66 & 72-76 are now moot.

### a. Requests for Production Nos. 65-76

Jim Hawk sent correspondence outlining issues with requests for production nos. 65-76 on June 28, 2022, and set a two-day deadline for Defendants to respond.  See Docket No. 120-1, pp. 16-18.  In this correspondence, Jim Hawk indicated they would be willing to discuss the issues over the phone.  Id. at 16.  Defendants responded to this correspondence on June 30, as requested, stating:

> In light of the short-turnaround for which you have requested a response, we will need additional time to review the issues raised in your letter.  Until we have had such opportunity to review and reconsider, our position on these issues remains consistent with the objections and responses previously articulated to these discovery requests.

Docket No. 120-1, p. 19.  The very next day, July 1, 2022, Jim Hawk filed this motion to compel.  See Docket No. 120.

Filing a motion to compel one day after Defendants indicated they would need more time to review and properly respond to issues with the discovery requests is certainly not a good faith effort by Jim Hawk to resolve this dispute without court intervention.  See Compass Bank v. Shamgochian, 287 F.R.D. 397, 400 (S.D. Tex. 2012) ("Plaintiff's single letter unilaterally identifying flaws in Defendant's discovery responses and setting an arbitrary response deadline for Defendant would seem to be inadequate, as it does not equate to a good faith conferral or attempt to confer.").  Therefore, Jim Hawk's motion to compel requests for production nos. 65-76 are denied pursuant to FED. R. CIV. P. 37(a)(1).

### b. Requests for Production Nos. 7 & 8

Defendants also assert that Jim Hawk failed to meet and confer on requests for production nos. 7 & 8.  Docket No. 145, p. 28.  Defendants argue that while Jim Hawk indicated the discovery on these requests were deficient, "no actual conferral occurred with regard to these requests."  Id.  On March 31, 2022, Jim Hawk sent correspondence addressing issues with requests for production nos. 7 and 33.  Docket No. 120-1, p. 11.  Defendants did not respond to this correspondence.  Then, on June 27, 2022, Jim Hawk sent correspondence addressing issues with requests for production nos. 7, 8, and 33 and stated they would be willing to meet and confer on these issues if Defendants had concerns.  Docket No. 120-1, p. 13.  Defendants responded to this correspondence, but did not address any issues raised by Jim Hawk.  See Docket No. 120-1, p. 12.  The court believes Jim Hawk has exhausted its obligations to meet and confer on requests for production nos. 7 & 8.  The lack of conferral on issues with regard to these discovery requests was due to Defendants' refusal to respond to the issues addressed in Jim Hawk's multiple correspondences.  The failure to confer was not attributable to lack of effort on Jim Hawk's part.

### 2.    Jim Hawk's Requests for Production Nos. 7 & 8

Jim Hawk requests that the court compel Defendants to produce "[a]ny and all documents and/or communications reflecting any service, parts and trailer sales business Crossroads engaged in" before and after December 2019.  Docket No. 105-1, p. 28.  Defendants argue these requests "are the definition of

a 'fishing expedition,'" and are vague, overbroad, and unduly burdensome.
Docket No. 145, p. 4.

"Mere speculation that information might be useful will not suffice;
litigants seeking to compel discovery must describe[,] with a reasonable degree
of specificity, the information they hope to obtain and its importance to their
case." Woodmen of the World, 2007 WL 1217919, at *1 (citing Cervantes v.
Time, Inc., 464 F.2d 986, 994 (8th Cir. 1972)). Jim Hawk asserts this
documentation is discoverable because it:

> (1) will demonstrate which customers are 'new' to Crossroads
> following the bad acts of Defendants; (2) which customers have
> increased their business with Crossroads following the bad acts of
> Defendants; (3) what revenue Crossroads has received from this
> new and increased business; (4) what specific work Crossroads is
> performing for such customers in comparison to the work
> performed by JHTT; and (5) any communications with these
> customers, including whether unlawful means were used by the
> Defendants to transition customers from JHTT to Crossroads.

Docket No. 177, p. 3. In order to address Defendants' concerns on the
unlimited time period within this request, Jim Hawk has *subsequently* agreed
to limit these requests to March 1, 2018, to the present. Docket No. 177, p. 2.

Aside from the lack of a time restriction, Defendants argue these
requests are vague, overbroad, [and] unduly burdensome," and Defendants do
"not know what documents [Jim Hawk] seeks with these requests." Docket No.
145, p. 4. Instead, Defendants have referred Jim Hawk to its website, which
they assert "contains responsive information about its service, parts, and
trailer business." Id.

58

Jim Hawk argues the website is not responsive to these requests, as the website "does not contain names of customers, the type of business conducted with each customer, the volume of business conducted with such customers and/or the revenue generated from the business conducted with such customers." Docket No. 120, p. 3. But these concerns raised by Jim Hawk are not addressed in their requests for production—they are broadly requesting any and all documents/communications reflecting any service, parts and trailer sales business Crossroads engaged in.

These requests leave the court with question as to what exactly Jim Hawk is seeking. Do they want sales information from all of Defendants' approximately 12,000 customers, or only mutual customers with Jim Hawk? Jim Hawk also asserts that these requests "seek discoverable documentation and communications relating to customers sales." Docket No. 177, p. 3. But what type of documents or communications related to sales? Financial records, income statements, sales reports, emails, phone calls, text messages? Even with Jim Hawk's concession to limit this request to March 1, 2018 to present, the court finds that Jim Hawk has not "describe[d], with a reasonable degree of specificity, the information they hope to obtain" with these requests. See Woodmen of the World, 2007 WL 1217919, at *1. These uncertainties could have been clarified by the parties during one of the many meet and confer conferences. Therefore, Jim Hawks request for production nos. 7 & 8 are denied.

### 3.    Jim Hawk's Request for Production No. 33

Jim Hawk requests that the court compel Defendants to produce "documents that identify Crossroads' customers and customer targets over a defined period of time."  Docket No. 120, p. 7.  Defendants request that this court reconsider and clarify its prior order,[4] arguing Jim Hawk's request should only include documents that "identify" not "reference" mutual customers and the request "exceeds the scope of the Parties' Electronic Discovery Agreement by ten-fold."  Docket No. 145, pp. 5-8.  Defendants' request is without merit.

When ruling on Jim Hawk's Request for Production No. 33 previously, this court ordered "Crossroads to produce all documents that identify mutual customers for the period of January 1, 2017, to present."  Docket No. 136, p. 11.  In no way does Jim Hawk's request seek documents that "reference" mutual customers nor does this court's order require Defendants to produce documents that "reference" mutual customers—it simply states they must produce documents "identify[ing]" mutual customers.  Id.; see also Docket No. 120, p. 3.

Additionally, any issues Defendants had with the scope or relevancy of Jim Hawk's request or this court's previous order should have been taken up in a motion to reconsider pursuant to Fed. R. Civ. P. 60, not in a response to a separate motion to compel.  This court stands by its previous order requiring Defendants to produce "all documents identify[ing] mutual customers for the

---

[4] See Docket No. 136, pp. 10-11

Case 4:20-cv-04058-KES   Document 183   Filed 01/23/23   Page 61 of 68 PageID #: 7001

period of January 1, 2017, to present." Docket No. 136, p. 11. With this,
Defendants' requests for clarification have already been answered. This court
is not requiring Defendants produce documents "referencing" mutual
customers, only "identifying." This order requires Defendants to collect
documents, ESI or otherwise, from a period of January 1, 2017, to present.
And the parties have already identified the mutual customers that would be
relevant to this request. See Docket No. 105-1, pp. 121, 123; Docket No. 110,
pp. 20-21. Thus, Jim Hawk's request is granted.

### 4.     Jim Hawk's Request for Additional ESI

Jim Hawk requests that the court compel Defendants to "search and
produce communications with customers." Docket No. 120, p. 11. Jim Hawk
believes these additional searches could "demonstrate what business
Crossroads is conducting with JHTT customers, and what business has been
diverted from JHTT." Id. at 10. Additionally, Jim Hawk believes "this
information could show how Crossroads is pricing its products, and to what
extent it used or is using JHTT's confidential information to do so." Id. at 11.

Again, the scope and limits of ESI discovery are governed by FED. R. CIV.
P. 26(b). Defendants "need not provide discovery of [ESI] from sources that the
party identifies as not reasonably accessible because of undue burden or cost."
FED. R. CIV. P. 26(b)(2)(B). Defendants have the burden to show that Jim
Hawk's ESI requests are not "reasonably accessible." Id. But the court may
nonetheless compel additional ESI discovery "if the requesting party shows
good cause." Id.

61

Defendants first argue that Jim Hawk's request is vague, as it is unclear which customers Jim Hawk is seeking information from—communications with all customers, communications with Crossroads' customers, communications with all Jim Hawk's customers, or just communications with mutual customers.  Docket No. 145, p. 19.  The court agrees.  Jim Hawk has failed to indicate "with a reasonable degree of specificity," which customers they are seeking information from.  Woodmen of the World, 2007 WL 1217919, at *1.  In both briefs, Jim Hawk requests, "communications with customers," "search for customer communications," "communications with Crossroads' customers," and "additional communications between Crossroads and customers."  See Docket No. 120, pp. 10-11; Docket No. 177, pp. 9-10.  The court cannot ascertain *which group of customers* Jim Hawk hopes to obtain additional ESI discovery on.  Therefore, the court finds that this discovery request is not "reasonably accessible."

Similarly, Defendants assert there would be substantial cost in conducting additional ESI discovery.  Docket No. 145, p. 22.  Defendants state they have incurred costs of $25,757.65 with their ESI vendor, excluding attorneys' fees, and "cannot estimate the costs [of further review] because it does not know the size of the additional ESI collection."  Id.  Jim Hawk disputes this, stating the additional 30 days of data should only cost around $4,292.94.  Docket No. 177, p. 10.  But, whether burdensome or not, there still would be costs involved with additional ESI discovery.

In fact, Defendants assert, and Jim Hawk concedes, that Defendants'
initial ESI review and production included relevant customer communications.
Docket No. 177, p. 10.  In response, Jim Hawk simply states, "the list of ESI
search terms did not include all relevant customer names."  Id.  But which
relevant customers names?  Without more specifics on which group of
customers Jim Hawk is seeking communications from, this request is not
"reasonably accessible."

Nonetheless, the court can compel this additional ESI discovery if Jim
Hawk shows good cause.  Courts consider seven factors to determine whether a
showing of "good cause" has been made: "(1) the specificity of the discovery
request; (2) the quantity of information available from other and more easily
accessed sources; (3) the failure to produce relevant information that seems
likely to have existed but is no longer available on more easily accessed
sources; (4) the likelihood of finding relevant responsive information that
cannot be obtained from other, more easily accessed sources; (5) predictions as
to the importance and usefulness of the further information; (6) the importance
of the issues at stake in the litigation; and (7) the parties' resources."  Helmert
2010 WL 2179180, at *8.

For the first factor, as addressed previously, the court finds that Jim
Hawk's request is not specific, thus this factor favors Defendants.  Factor two
also favors Defendants, as there has been significant ESI discovery in this case,
including the production of customer communications.  See Docket No. 145,

pp. 20-21; Docket No. 177, p. 10.  Factor three favors neither party as there is no claim of spoilage of ESI data.

Factors four and five also favor Defendants.  Defendants assert that further search and review for all customer communications would not yield much more relevant evidence.  Jim Hawk relies on the testimony of Dan Buckley and Jim Murphy to assert that "customers were being told incorrect information about JHTT and warrants searching for additional customer communications."  Docket No. 177, p. 11.  But the testimony of these two individuals does not evidence the likelihood of Defendants finding additional relevant information beyond the customer communications that have already been produced.  As held previously, factor six would favor Defendants, as this litigation is not a matter of public concern, and factor seven is irrelevant because neither party has shared with the court information on their resources.  See Docket No. 136, pp. 18-19.

While "[a] court should not treat the 'good cause' factors as a checklist," here each factor either favors Defendants or is neutral.  Johnson, 2010 WL 4065368, at *2 (citing Helmert, 2010 WL 2179180, at *9).  Given the lack of specificity in Jim Hawk's request, the fact that relevant customer communications have already been produced, and the low likelihood of additional searches yielding more relevant information, the court finds Jim Hawk has failed to show "good cause" for the production of ESI that is not "reasonably accessible."  FED. R. CIV. P. 26(b)(2)(B).  Thus, Jim Hawk's motion to compel additional ESI discovery on "communications with customers" is

denied.  Jim Hawk makes a separate argument to expand the date range
parameter of ESI discovery from June 1, 2020, to June 30, 2020.  Docket
No. 177, p. 12.  Because this court is denying Jim Hawk's request for
additional ESI discovery, this issue is moot.

### 5.    Jim Hawk's Request for Defendants' Financial Documents

Jim Hawk requests that the court compel Defendants to produce
financial documentation beyond its Sioux Falls and Luverne branches.  Docket
No. 120, p. 11.  This request comes in response to Defendants' motion to
compel the production of financial documents from all Jim Hawk's branch
locations.  Id.; see, *supra* Section B(2).  Jim Hawk contends that "the
discoverability of such information for either JHTT's or Crossroads' other
locations is similar, and thus any expansion of financial record production
should be mutual.  Docket No. 177, p. 12.

Jim Hawk asserts that these documents "may show that a national
customer that was improperly taken by the Defendants significantly increased
its business at another Crossroads' location due to the wrongful acts of
Defendants."  Docket No. 120, p. 11.  However, as this court has previously
held, Jim Hawk's request for production of "[a]ny and all bank statements or
records for Crossroads" should be limited to records from Defendants' Sioux
Falls and Luverne locations because "Jim Hawk has not alleged wrongful
conduct beyond these two locations."  Docket No. 136, p. 6.

As this court discussed in Section B(2), Defendants are requesting the
underlying "raw data" income statements for the Jim Hawk Group branches

that make up the aggregated financial information used by Jim Hawk's expert to calculate lost profits.  Docket No. 176-1.  Because Jim Hawk placed the revenue and profit history of all its branches at issue by having its expert rely on aggregated income statements for the whole company, it made Defendants' request relevant and not overboard.  Review of these financial records by Defendants may reveal calculation errors in the aggregated data relied on by Jim Hawk's expert.

But, as this court prefaced, Jim Hawk would not be compelled to produce these records if their current expert report is withdrawn and replaced with a new one that analyzes only the profits of Jim Hawk's Sioux Falls branch, without a comparison to general aggregated company income statements. Thus, in keeping with this court's previous order, Jim Hawk's request for production of financial documents beyond Defendants' Sioux Falls and Luverne locations is denied.

### 6.    Whether Jim Hawk is Entitled to Attorneys' Fees

Jim Hawk requests that the court award attorneys' fees for bringing this motion to compel under Federal Rule of Civil Procedure 37(a)(5)(A-C).  Docket No. 177, p. 13.  The court orders Jim Hawk to serve Defendants within twenty-one (21) days of the date of this opinion a motion for attorneys' fees together with a detailed accounting of the time spent in preparing and defending this motion.  Defendants shall have twenty-one (21) days to respond in opposition thereto.  Jim Hawk may file a reply within fourteen (14) days.  If objections are lodged to this opinion, all litigation over attorneys' fees will be suspended until

the outcome of such objections is known.  If objections are timely filed, Jim Hawk shall hold in abeyance any motion for attorney's fees until the objections are resolved.

The court notes that both parties won some issues and lost some issues on each of their respective motions.  Total attorney time for making the motions would accordingly be reduced based on the nature of the outcome gained.  An award of attorney's fees to each party will likely be "a wash." Therefore, the court asks both parties to take this into consideration before spending their clients' money embarking on further litigation over attorney's fees on these motions.

## CONCLUSION

Based on the foregoing facts, law, and analysis, it is hereby:

ORDERED that Defendants' motion to compel [Docket No. 116] is granted in part and denied in part in accordance with this opinion.  Plaintiff shall provide, within 21 days of the date of this order, documents or answers to interrogatories responsive to these discovery requests, unless objections are filed.

It is further ordered that Plaintiff's motion to compel [Docket No. 119] is granted in part and denied in part in accordance with this opinion.  Defendants shall provide, within 21 days of the date of this order, information and copies of documents responsive to these discovery requests, unless objections are filed.

## NOTICE OF RIGHT TO APPEAL

Pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this order before the district court upon a showing that the order is clearly erroneous or contrary to law.  The parties have fourteen (14) days after service of this order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(A), unless an extension of time for good cause is obtained.  See Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 23rd day of January, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge