UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JIM HAWK TRUCK-TRAILERS OF SIOUX FALLS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> CROSSROADS TRAILER SALES & SERVICE, INC., ALVIN SCHOLTEN, MARK SNEVE, MICHAEL FALOR, DAVID JENSEN, TRACY THOMPSON, NICK BIG EAGLE, CHAZ KOHORST,[1] TAYLOR LARSON, and DEREK FALOR, <br><br> Defendants. | 4:20-CV-04058-KES <br><br><br> ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

**FACTUAL BACKGROUND**

Pending before the court is defendants' summary judgment motion. Docket 121. This case arises from a group of former Jim Hawk Trailers of Sioux Falls, Inc. (Jim Hawk) employees moving to Crossroads Trailer Sales and Service Inc. (Crossroads), and what these individual employees as well as Crossroads did throughout the transfer process. *See* Docket 1. The below table summarizes Jim Hawk's surviving claims against the various defendants up to this point.[2]

---

[1] Chaz Kohorst's name is spelled inconsistently throughout the docket. *Compare, e.g.*, Docket 121, *with* Docket 157. In his employment application to Crossroads, he spelled his name "Kohorst," and thus the court assumes that is the correct spelling. *See* Docket 124-52 at 1.

[2] The court previously dismissed several claims (Tortious Interference With Business Relations, Unjust Enrichment, Unfair Competition, Civil Conspiracy )

1

| Claim Number | Claim | Defendant(s) |
|---|---|---|
| 1 | Misappropriation of Trade Secrets Under the Defend Trade Secrets Act (18 U.S.C. § 1836) | Crossroads, Alvin Scholten, Mike Falor, Mark Sneve, Dave Jensen, Tracy Thompson, and Derek Falor |
| 2 | Misappropriation of Trade Secrets Under South Dakota's Uniform Trade Secrets Act (SDCL § 37-29-1) | Crossroads, Alvin Scholten, Mike Falor, Mark Sneve, Dave Jensen, Tracy Thompson, and Derek Falor |
| 3 | Breach of Duty of Loyalty | Alvin Scholten, Mike Falor, Mark Sneve, Dave Jensen, Tracy Thompson, Derek Falor, Nick Big Eagle, Chaz Kohorst, and Taylor Larson |
| 4 | Tortious Interference With Business Relations | Crossroads, Alvin Scholten, Mike Falor, Mark Sneve, Dave Jensen, Tracy Thompson, and Derek Falor |
| 5 | Tortious Interference With Employment Relationships | Crossroads, Alvin Scholten |
| 6 | Civil Conspiracy | Crossroads, Alvin Scholten, Mike Falor, Mark Sneve, Dave Jensen, Tracy Thompson, and Derek Falor |
| 7 | Unjust Enrichment | Crossroads, Alvin Scholten, Mike Falor, Mark Sneve, Dave Jensen, Tracy Thompson, and Derek Falor |
| 8 | Unfair Competition | Crossroads, Alvin Scholten, Mike Falor, Mark Sneve, Dave Jensen, Tracy Thompson, and Derek Falor |
| 9 | Defamation | Alvin Scholten |

---

against the mechanic defendants (Nick Big Eagle, Chaz Kohorst, and Taylor Larson). *See* Docket 78 at 15.

2

The court recites a broad overview of the facts in the light most favorable to the non-moving party, Jim Hawk.

Jim Hawk is a Sioux Falls trailer dealer and business that sells semi-truck trailers, parts, and service. *See* Docket 166 at 2. Crossroads is a trailer business in Sioux Falls. *See* Docket 157-19 at 6-7. Crossroad's president is Mark Habben, and its vice president is Brian Johnson. *See id.* at 194, 211.

Alvin Scholten began working at Jim Hawk in 2004 as a trailer salesman and eventually took over as the general manager of Jim Hawk in 2015. *See* Docket 157-16 at 4-5. Jim Hawk fired Scholten in December 2019. *See id.* at 19. Soon after, Scholten began talking with Crossroads about potential employment, and joined Crossroads in January 2020. *See id.* at 22, 24. Prior to officially joining Crossroads, Scholten talked to Jim Hawk employees Mike Falor, Tracy Thompson, and Dave Jensen about the potential for them to work at Crossroads. *See id.* at 24. At some point, Scholten also talked to Jim Hawk employee Derek Falor, Mike Falor's son, about the possibility of Derek Falor joining Crossroads. *See id.* at 28; Docket 157-13 at 5.

Eventually, Mike Falor, Tracy Thompson, and Dave Jensen all left Jim Hawk and officially started working at Crossroads on March 16, 2020. *See* Docket 157-13 at 23-24; Docket 157-14 at 49; Docket 157-18 at 39. Crossroads also hired three Jim Hawk mechanics, Nick Big Eagle, Chaz Kohorst, and Taylor Larson, who all started working at Crossroads on March 16, 2020. *See* Docket 133 ¶ 234; Docket 160 at 46.

3

Other than Scholten, the individual defendants left Jim Hawk without giving Jim Hawk advance notice of their departure. *See* Docket 157-38 at 18; Docket 157-13 at 26; Docket 157-12 at 13; *See* Docket 157-16 at 19 (showing Jim Hawk fired Scholten). All of them were at-will employees. *See* Docket 157-33 at 47.

Broadly speaking, Jim Hawk alleges the individual defendants took trade secret information and gave it to Crossroads, improperly directed Jim Hawk customers to Crossroads while still working for Jim Hawk, or improperly interfered with Jim Hawk's employees, all to the benefit of Crossroads and the detriment of Jim Hawk. *See* Docket 159 at 8-11. Jim Hawk further alleges that Crossroads improperly took trade secret information and improperly interfered with Jim Hawk's customers and employees. *See id.* Jim Hawk additionally alleges Scholten defamed it by telling its employees that its parts department might be sold or closed, and that the employees' jobs might be at risk. *See id.* at 85.

Defendants move for summary judgment in all claims against them. *See* Docket 121. The court discusses each claim and supplements the factual accounts for the relevant claims.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the

4

nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and also identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment "must be denied if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party." *Krenik* 47 F.3d at 957. It is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

### I.   Misappropriation of Trade Secrets

#### A.   Factual Background

Viewing the record in the light most favorable to Jim Hawk, the record shows the following additional facts relevant to the disposition of Jim Hawk's trade secret claims:

After Jim Hawk fired Scholten, Scholten took and gave Crossroads a Jim Hawk General Ledger Balance sheet through October 2019 that contained information on profits, losses to date, net income, loss, the value held in the company, and Jim Hawk's retained earnings, expenses, and inventories. *See* Docket 157-16 at 35; Docket 153 at 20. Scholten also took Jim Hawk's most recent profit and loss statement, which showed Jim Hawk's net profit for each department every month for the year to date. *See* Docket 157-16 at 16. Additionally, he took a single-spaced, 14 ½ page customer list containing customers' names, addresses, contact person, trailer type information, and other information, from Jim Hawk and brought it to his Crossroad's office. *See id.* at 16, 18, 50-64.

Mark Sneve started working at Jim Hawk in 1984, and eventually became a service manager. *See* Docket 157-17 at 5-6. Because of his position, Sneve knew Jim Hawk's pricing information, customer preferences, cost of services, and financial information including profit margins. *See, e.g.*, Docket 153 ¶¶ 39-42; Docket 157-17 at 8-9. Sneve left Jim Hawk to work for Crossroads, in a similar position to what he did at Jim Hawk. *See* Docket 157-

6

17 at 6, 9, 24, 29. Sneve stated that he wanted to "put Jim Hawk out of business" and "take all the business from Jim Hawk." Docket 157-37 at 6. Additionally, Sneve intentionally misrepresented to multiple Jim Hawk employees that he was retiring, when in reality he knew he was going to work for Crossroads. *See* Docket 157-38 at 8; Docket 157-22 at 31; Docket 157-36 at 4.

Derek Falor started working at Jim Hawk in 2018. Docket 157-12 at 4. He left Jim Hawk on March 13, 2020 and started working in Operations at Crossroads on March 16, 2020. *See id.* at 16. While leaving Jim Hawk, he took a USB thumb drive containing Jim Hawk customer information. *See id.* at 18. Derek Falor testified that he did not access the thumb drive after leaving Jim Hawk, and further testified that he did not share any of the thumb drive contents with anyone at Crossroads. *See id.* The thumb drive also contains a document that has the Crossroads label and has information for a company called "Ace Towing, Inc." *See* Docket 157-10 at 1. Additionally, Derek Falor testified that he saved the information because he "wanted access" to it later on. Docket 157-12 at 18.

Mike Falor, Jensen, and Thompson left Jim Hawk on March 12, 2020 and officially started working at Crossroads on March 16, 2020. *See* Docket 157-13 at 5, 26; Docket 157-14 at 40, 49; Docket 157-18 at 32, 34, 38-39. Mike Falor forwarded a credit application from a vendor, a customer list, and pricing information to his personal email while employed at Jim Hawk. Docket 157-13 at 41-42, 75-82, 102-151. Mark Habben testified on behalf of

7

Crossroads that Mike Falor forwarded the credit application to Crossroads because Mike Falor sought to "replicate the business" he did at Jim Hawk when he arrived at Crossroads. *See* Docket 157-19 at 29. Mike Falor also texted vendor information, which was unavailable to the public, to Mark Habben. *See* Docket 157-13 at 27, 33, 48-72; Docket 153 at 22.

Jensen sent over a vendor list and customer information to Crossroads. *See* Docket 157-14 at 35, 39-40, 49, 59-60, 65, 74-80; Docket 153 at 22. Thompson forwarded numerous things from his Jim Hawk email to his personal email, including several customer lists with financial and profit information, a link to a document including his own sales totals, and several history reports including customer names and profit information. *See, e.g.*, Docket 153 at 23-25; Docket 157-3; Docket 157-4; Docket 157-5; Docket 157-7; Docket 157-8; Docket 157-9; Docket 157-18 at 28-30; Docket 157-54. Thompson asked Curt Westphal, a Jim Hawk employee, to send Thompson's customer lists to Thompson so that Thompson could "take [them] with [him]" to Crossroads. Docket 157-25 at 28.

All of these individual defendants signed an acknowledgment form indicating that they had received and understood Jim Hawk's employee handbook. *See* Docket 153 at 16. This handbook directs employees to "not discuss the corporation's confidential business with anyone who does not work for [Jim Hawk]." Docket 157-56 at 2. It further provides that "giving confidential or proprietary information to competitors or other organizations…" is grounds for "immediate dismissal without warning[.]" Docket 157-57 at 2.

8

Crossroads received an email from Derek Falor with the subject line "Pricing comparison Tectran/Goodyear." *See* Docket 157-19 at 35. This email included comparisons between what Jim Hawk can purchase items for compared to what it would cost to purchase it through another supplier, Great Dane. *See id.* at 191-93. In response to this email, Crossroads said, "Thanks, Derek. Are all/most of the prices from Hawk purchased through Vipar?" *See id.* at 36. Crossroads has a handbook for all of its employees to sign, similar to Jim Hawk. *See* Docket 157-19 at 11. Crossroads admitted that it would violate Crossroads's policy if one of its own employees sent this kind of information to a competitor. *See id.* at 11, 75 (listing price lists and financial information, among other items, to be confidential information not to be disclosed). Disclosing this kind of information subjects a Crossroads employee to disciplinary action, including termination. *See id.* Crossroads received many more customer lists and other information from the individual defendants. *See, e.g.*, Docket 157-19 at 153 (customer list), 196-204 (same); 157-13 at 37 (specific part orders for certain customer); Docket 157-14 at 49 (customer list), 59-60 (vendor list); 74-80 (customer list).

Jim Hawk took several steps to protect its confidential information. For example, it required all employees to sign a handbook that expressly directs employees to "not discuss the corporation's confidential business with anyone who does not work for us." Docket 157-56 at 2; *see also* Docket 157-58 at 4 (defining company-protected information to include "development of policies, procedures or *other internal business-related confidential communications*, as

9

well as upcoming product releases and *financial information and products sold* []" (emphasis added)); Docket 153 at 16 (noting Jim Hawk requires all employees to review, acknowledge, and abide by handbook). Jim Hawk also limits access to information about pricing, profitability, and customer lists to employees who need the information. *See* Docket 157-33 at 43 (discussing mechanics lack of access to pricing information). Additionally, Jim Hawk requires employees to have password protected phones, and it locks physical file cabinets with documents containing confidential information. *See id.* at 44. Jim Hawk further talked to its employees about not disclosing confidential information to competitors on a "daily basis." *See id.* at 17; 44 ("[E]veryone in the company basically I've had these conversations [about maintaining confidentiality of sensitive information] with in one way or another.").

Jim Hawk's customer and vendor lists took significant time and effort to create. For example, many Jim Hawk employees (including some of the individual defendants) testified that while at Jim Hawk, they acquired new customers by either cold calling them or driving around to look for trucking companies. *See* Docket 157-14 at 7 (Jensen explained "[he] would drive and go find the trucking companies."), 11 (Jensen explained "[he] would have to go out and call on [new customers], earn their business."); Docket 157-18 at 10 (Thompson explained that he visited between 50-75 customers a week, in part to solicit potential business); Docket 157-25 at 5 (Curt Westphal, a then-Jim Hawk sales manager, explained that he would "drive around and keep [his] eyes open and go in and cold call on customers[.]"); Docket 157-22 at 4-5 (Bill

Forsling, a Jim Hawk salesman, described his previous and current practice of cold-calling potential customers). Similarly, Jim Hawk's corporate representative testified that its vendor relationships "take years to get in place[,]" and that "everything [Jim Hawk] do[es] takes a long time to set up and procure the relationships of vendors[.]" Docket 157-33 at 22.

None of the individual defendants signed a confidentiality or non-disclosure agreement. *See* Docket 157-33 at 16-17.

### B.    Legal Background

Congress passed the Defend Trade Secrets Act of 2016 (DTSA) that allows an owner of a trade secret to sue a defendant for misappropriating a trade secret if such secret is "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 564 (8th Cir. 2019). Similarly, South Dakota's Uniform Trade Secrets Act provides a private cause of action for misappropriation of a trade secret. *See* SDCL § 37-29-3.

The court analyzes these two trade secret claims together. *See, e.g., Ahern Rentals, Inc. v. EquipmentShare.com Inc.,* No. 22-1399 slip op. at 9 (8th Cir. Feb. 7, 2023); *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1016-17 (8th Cir. 2020). Both statutes require a two-step inquiry: first, the court must decide whether Jim Hawk has a protectable trade secret, and second, if so, the court must decide whether any of the defendants misappropriated the trade secrets. *See id.*; *Daktronics, Inc. v. McAfee*, 599 N.W.2d 358, 361 (S.D. 1999).

### C.     Is there a protectable trade secret?

"Without a proven trade secret, there can be no action for misappropriation, even if defendants' actions were wrongful." *Daktronics*, 599 N.W.2d at 361 (citation omitted). Under federal law, the existence of a trade secret is a question of fact. *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (8th Cir. 2021). Under South Dakota law, the existence of a trade secret is a mixed question of law and fact. *Aqreva, LLC v. Eide Bailly, LLP*, 950 N.W.2d 774, 789 (S.D. 2020). Specifically, whether the alleged secret constitutes "information, including a formula, pattern, computation, program, device, method, technique or process" is a question of law. *See id.* (citation omitted). But determining whether the alleged secret derives independent economic value that is not generally known and cannot be readily ascertainable, and whether its holder took reasonable efforts to maintain its secrecy is a question of fact. *See id.* SDCL § 37-29-1(4). Because defendants do not contest whether the alleged secrets constitute "information," the remaining questions are questions of fact.

### 1. Generally Known or Readily Ascertainable?

While "[i]nformation that is public knowledge or that is generally known in an industry cannot be a trade secret[,]" a trade secret must also not be readily ascertainable. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984); 18 U.S.C. § 1839 (3)(B); SDCL § 37-29-1 (4)(i). Information cannot be a trade secret if it is generally known within an industry even if not known to the public at large. See *Daktronics, Inc.*, 599 N.W.2d at 362.

12

### a. Customer and Vendor Lists

Defendants argue that the customer lists, vendor lists, and contact information are all generally known or readily ascertainable. *See* Docket 132 at 29-30. They argue that Jim Hawk's customers are readily ascertainable because someone could "simply view[] the trucks and trailers that appear outside one of [Jim Hawk's] branch's place of business." *Id.* at 30. But this argument fails for several reasons. First, Jim Hawk testified that some of the trailers do not have the identity of the customers' label on the trailers, and thus there is already a dispute about whether this identification method is viable. *See* Docket 157-33 at 12-13. Second, even if every trailer had the identity of the customers clearly marked, at the very least a jury could find that to not be readily ascertainable, because that would require significant time and resources to sit outside one of Jim Hawk's locations and record each and every trailer that passed by.

Defendants also point to Polk Reports, which "show the trailers that were sold in a particular county in the state." *Id.* at 13. But the record is unclear whether these reports identify the manufacturer or the dealer that sold the trailer. *See id.* And even if the Polk Reports did identify the dealer that sold the trailer, this information would only show that individual trailer, and not all the various parts or services that the customer may have purchased from Jim Hawk. *See, e.g.*, *id.* at 9 (describing the various aspects of Jim Hawk's business). Similarly, although defendants cite the industry-trade associations such as the South Dakota Truckers Association, Jim Hawk III stated in his

declaration that those lists of customers and potential vendors do not specify precisely the identities of Jim Hawk's customers. Docket 166 at 13-14.

Multiple Jim Hawk employees (including some of the individual defendants) testified that while at Jim Hawk, they acquired new customers by either cold calling them or driving around to look for trucking companies. Jensen testified that "[he] would drive and go find the trucking companies," and would "have to go out and call on [new customers], [to] earn their business." *See* Docket 157-14 at 7, 11. Thompson explained that he visited on average between 50-75 customers a week, in part to solicit potential business. *See* Docket 157-18 at 10. Curt Westphal, a then-Jim Hawk sales manager, testified that he "dr[ove] around and ke[pt] [his] eyes open and [went] in and cold call[ed] on customers[.]"). Docket 157-25 at 5. Bill Forsling, a Jim Hawk salesman, also confirmed that he still cold-calls customers to solicit more business. *See* Docket 157-22 at 4-5. Similarly, Jim Hawk's corporate representative testified that its vendor relationships "take years to get in place[,]" and that "everything [Jim Hawk] do[es] takes a long time to set up and procure the relationships of vendors[.]" Docket 157-33 at 22.

Viewing the facts in the light most favorable to Jim Hawk, there is a genuine dispute about whether Jim Hawk's customer lists are readily ascertainable.

Although the Eighth Circuit observed in *Fox Sports Net North, L.L.C. v. Minnesota Twins Partnership*, 319 F.3d 329, 335-36 (8th Cir. 2003) that "*knowledge* of industry contact people does not rise to the level of trade

14

secret[,]" it did so because the information in that case was "readily ascertainable within [the] trade." (emphasis added). Here, Jim Hawk focuses on actual lists rather than mere knowledge, and as discussed above, the compilation of the lists required significant effort and thus there is a dispute over whether the lists are readily ascertainable.

Similarly in *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005), the plaintiff conceded that its customers' identities were not confidential information. Here, Jim Hawk has put forth sufficient evidence for the jury to find otherwise, and thus *Hecny* provides little support for defendants' motion.

Finally, this case differs from *Harley Automative Group, Inc. v. AP Supply, Inc.*, No. Civ. 12-1100, 2013 WL 6801221 (D. Minn. Dec. 23, 2013). In *Harley*, the court observed that in Minnesota, customer lists have "generally not been considered to be trade secrets." *Id.* at *7. The court held that the customer lists at issue did not constitute a trade secret because, among other reasons, "the record establishe[d] that [the Plaintiff] purchase[d] information" on "a publicly available source," and that plaintiff's employees "used the internet to find information[.]" *Id.* at *8. Here, as discussed above, the record contains evidence which, viewed in the light most favorable to Jim Hawk, suggests that defendants did not merely gain customer information from online sources. Rather, it suggests that Jim Hawk employees spent considerable time and effort to cultivate its list, given that multiple individuals testified that they acquired new customers by cold calling potential customers and physically visiting them. *See, e.g.*, Docket 157-25 at 5; Docket 157-22 at 4.

15

Given the amount of time and effort that it would take to cold-call each of the customers, collect their information, and compile it into a list, there is a genuine dispute over whether Jim Hawk's customer lists are a trade secret. Thus, summary judgment on this issue is denied.

### b. Customer Preferences and Pricing Information

Next, defendants argue that Jim Hawk's claims about specific customer preferences and pricing information for customers cannot constitute a trade secret because "any reasonably diligent competitor in the industry may merely ask a customer about their purchasing preferences." Docket 132 at 31-33. But the Eighth Circuit has rejected this argument, stating that "[t]he fact that information can be ultimately discerned by others—whether through independent investigation, accidental discovery, or reverse engineering—does not make it unprotectable." *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 973 (8th Cir. 2011). Instead, the relevant inquiry is whether acquiring this information "would require a substantial investment of time, effort, and energy." *Id.*

Here, while it is certainly true that a competitor may ask a customer about the customer's preferences, Jim Hawk III declared that customers do not "readily provide" this information. Docket 153 at 15. And furthermore, even if one customer may agree to provide this kind of information, the compilation of many customers all in one place is materially different from one individual customer theoretically disclosing their preferences. *See Kreisler Drug Co., Inc. Missouri Cvs Pharmacy, LLC v. Naber*, No. 14-01050-CV-W, 2016 WL 5844145,

16

at *7 (W.D. Mo. Oct. 4, 2016) (distinguishing between information and lists of compiled information). Indeed, "[c]ompilations are specifically contemplated in the UTSA definition of a trade secret, and the fact that some or even most of the information was publicly available is not dispositive . . . ." *AvidAir Helicopter*, 663 F.3d at 972. Compilations derive their value not from the secretive information they contain, but the competitive advantage that they give by saving valuable time and resources. *See id.*

Jim Hawk has submitted sufficient evidence in the record to show a genuine dispute of fact on whether the customer lists containing pricing information are a trade secret. One of the lists, for example, contains well over 125 customers with specific information about the purchase history of each listed customer. *See* Docket 157-4.  While a competitor could theoretically contact each of these customers separately and inquire about the pricing at which Jim Hawk provides its products and services, a jury could find that such a method shows the compiled information is not "readily ascertainable" given the significant amount of time it would take to compile. *See AvidAir Helicopter*, 663 F.3d at 972.

Defendants further argue that even if Jim Hawk's information on pricing and customer preferences at some point can be considered a trade secret, the information "typically becomes stale and loses its economic value within a matter of months." *See* Docket 132 at 32. As an initial observation, viewing the evidence in the light most favorable to Jim Hawk, at least a few then-employees of Jim Hawk forwarded customer orders and pricing information to Crossroads,

and then placed orders for such customers on behalf of Crossroads, in real time. *See* Docket 157-14 at 44; Docket 157-46 at 32. Thus, the information was not stale at that point.

Furthermore, the mere passage of time does not automatically render trade secret information stale. *See Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, 758 F.3d 1051, 1057 (8th Cir. 2014) (finding passage of four years alone did not deprive information of its economic value). Here, defendants suggest that COVID-19 caused significant disruptions in Jim Hawk's pricing methodology. *See* Docket 132 at 33. But the court finds a genuine dispute of fact about whether the pricing information is stale, because Jim Hawk III declared that "[e]ven older pricing information can provide an economic benefit to a competitor[,]" because "any pricing information that demonstrates a percentage discount being given to a customer from market price, or any pricing information that shows the percentage markup made by [Jim Hawk] on the sale of a product, would provide a competitor with the opportunity to undercut [Jim Hawk] in a sale." Docket 153 at 15. In short, there is a genuine dispute about whether Jim Hawk's price compilations constitute a trade secret.

### c. Financial Information

Finally, defendants argue that Jim Hawk's financial information is too general and "lacks the specificity necessary to qualify as a trade secret." Docket 132 at 34. The Eighth Circuit has recognized that "merely general categories of information" are insufficient to be a trade secret. *See Luigino's, Inc. v. Peterson*, 317 F.3d 909, 912 (8th Cir. 2003). But Jim Hawk's claims about its financial

information are not merely general. Instead, Jim Hawk claims that combining

vendor pricing and the amount of money generated from sales helps reveal its

profitability. *See* Docket 159 at 30. This information on profitability, Jim Hawk

argues, provides a competitive advantage because "the competitor would then

be able to ascertain the price range that [Jim Hawk] may offer to a customer

based on its profitability." *Id.* The record, when viewed in the light most

favorable to Jim Hawk, shows that some of the defendants forwarded financial

information including the amount from which Jim Hawk acquired certain parts

from vendors, and how much Jim Hawk sold such parts to customers. *See*

Docket 157-3 at 2-5 (customer list and pricing information); Docket 157-4

(same); Docket 157-5 at 2-17 (same), Docket 157-6 (same); Docket 157-7

(same); Docket 157-8 (same); Docket 157-9 (same); Docket 157-46 (vendor list

and pricing); Docket 157-18 at 103-104 (vendor pricing information). Thus,

there is a material dispute about the importance of this financial information

and whether it constitutes a trade secret.

## 2. Reasonable Efforts to Maintain Secrecy?

Both the South Dakota and federal statute require that the party alleging

a trade secret violation took reasonable efforts to maintain secrecy. *See* SDCL

§ 37-29-1 (i); 18 U.S.C. § 1839(3)(A). "Reasonable efforts to maintain secrecy

need not be overly extravagant, and absolute secrecy is not required." *AvidAir*

*Helicopter*, 663 F.3d at 974. Defendants argue that Jim Hawk failed to take

reasonable efforts to maintain secrecy of the above-mentioned information,

because Jim Hawk did not require any of the individual defendants to sign a

confidentiality or non-disclosure agreement. *See* Docket 132 at 36; Docket 157-33 at 16.

But Jim Hawk has submitted sufficient evidence to dispute whether it acted reasonably in maintaining the secrecy of its information. For example, it required all employees to sign a handbook that expressly directs employees to "not discuss the corporation's confidential business with anyone who does not work for us." Docket 157-56 at 2; *see also* Docket 157-58 at 4 (defining company-protected information to include "development of policies, procedures or other internal business-related confidential communications, as well as upcoming product releases and financial information and products sold"); Docket 153 at 16 (noting Jim Hawk requires all employees to review, acknowledge, and abide by handbook). Jim Hawk also limits access to information about pricing, profitability, and customer lists to employees who need the information. *See* Docket 157-33 at 43 (discussing mechanics lack of access to pricing information). Additionally, Jim Hawk requires employees to have password protected phones, and it locks physical file cabinets with documents containing confidential information. *See id.* at 44. These measures create a genuine dispute about whether Jim Hawk took reasonable efforts to protect its secrets.

The cases defendants cite do not alter the court's analysis. Defendants cite *Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020), but unlike in this case, the plaintiff in *Famers Edge* "shared the information with a third-party contractor without a confidentiality agreement and without

other policies or practices for safeguarding secrets." As discussed above, the record indicates several policies Jim Hawk had in place to safeguard its secrets, and thus *Farmers Edge* is distinguishable. Similarly, *CDI Energy Services v. West River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) simply found that because the record "show[ed] little effort by [plaintiff] to conceal data as trade secrets," the district court did not clearly err in denying plaintiff's preliminary injunction. Here, viewing the record in the light most favorable to Jim Hawk, the record shows it engaged in more than a "little effort" given the protocols and policies it had in place. And *Electro-Craft Corp. v. Controlled Motion Inc.*, 332 N.W.2d 890, 902-03 (Minn. 1983) differs from this case, because the plaintiffs in *Electro-Craft* "treated its information as if it were not a secret" by, among other things, giving many informal tours to vendors and customers in its facilities, hosting an "open house" and inviting the public to "observe manufacturing processes." Here, Jim Hawk has submitted sufficient evidence that it took greater precautions than the plaintiffs in *Electro-Craft*.

The strongest case defendants cite is *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 53 (1st Cir. 2007), which held that the mere fact that the plaintiff "kept its work . . . private from the world is not sufficient" to show it took reasonable steps to protect the trade secret. Instead, the court held that there "must be affirmative steps to preserve the secrecy of the information as against the party against whom the misappropriation claim is made." *Id.* In *Incase*, the plaintiff, Incase, had begun working with the defendant, Timex on manufacturing watch holders for retailers. *See id.* at 50. While Incase worked with Timex, Incase had

21

given Timex access to Incase's design for price flags. *See id.* at 52. Timex, unbeknownst to Incase, relied on drawings of the price flags and ultimately produced different watch holders. *See id.* at 51.

The court found that Incase had failed to take reasonable steps to protect its trade secret of the price flag because, among other factors, Incase had "never articulated" to Timex that the price flag designs were confidential. *See id.* at 53. Here, although the record does not contain evidence that Jim Hawk labeled any of the relevant documents as confidential, Jim Hawk has shown sufficient evidence that it talked to its employees about not disclosing confidential information to competitors on a "daily basis." *See* Docket 157-33 at 17; 44 ("[E]veryone in the company basically I've had these conversations [about maintaining confidentiality of sensitive information] with in one way or another."). Furthermore, the steps Jim Hawk took went beyond merely protecting the information from the general public: for example, even certain employees did not have access to pricing information on parts. *See id.* at 44. Rather, only people who needed to have access to the pricing information within the company were allowed to view the information. *Id.* Thus, although the facts of *Incase* are similar to the facts here, the court finds that there is sufficient evidence in the record to present a genuine dispute over Jim Hawk's reasonableness in its actions to protect its trade secrets.

In short, there are genuine disputes of a material fact regarding whether Jim Hawk had trade secrets, and whether Jim Hawk took reasonable steps to protect such secrets.

22

### D. Did Defendants Misappropriate?

18 U.S.C. § 1839 (5) defines misappropriation as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who--
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
>>
>>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>>>
>>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>>
>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> (iii) before a material change of the position of the person, knew or had reason to know that--
>>
>>> (I) the trade secret was a trade secret; and
>>>
>>> (II) knowledge of the trade secret had been acquired by accident or mistake[.]

"Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" 18 U.S.C. § 1839(6). South Dakota defines misappropriation nearly identically. See SDCL § 37-29-1.

23

Jim Hawk alleges in its complaint that defendants Crossroads, Scholten, Falor, Sneve, Jensen, Thompson, and Derek Falor misappropriated trade secrets by disclosing or using a trade secret without express or implied consent by a person who at the time of disclosure or use knew or had reason to know that the knowledge the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret. *See* Docket 1 ¶¶ 77-78. In other words, Jim Hawk alleges these defendants misappropriated trade secrets under 18 U.S.C. § 1839 (B)(ii)(II).

### 1. Alvin Scholten

Scholten argues that he did not misappropriate anything because although he sent Crossroads a customer list after Jim Hawk fired him, Scholten sent the list to "avoid duplicating customer calls with Crossroads' other outside salesman[,]" rather than to "identify new customer targets[.]" *See* Docket 132 at 39.

As an initial matter, viewing the record in the light most favorable to Jim Hawk, Scholten sent Crossroads more than just a customer list. For example, Scholten took a Jim Hawk General Ledger Balance sheet through October 2019 that contained information on profits, losses to date, net income, loss, the value held in the company, and Jim Hawk's retained earnings, expenses, and inventories. *See* Docket 157-16 at 35; Docket 153 at 20. And he took Jim Hawk's most recent profit and loss statement, which showed Jim Hawk's net profit for each department every month for the year to date. *See* Docket 157-16 at 16. Thus, these additional documents alone show a genuine dispute of

material fact about whether Scholten misappropriated trade secrets to

Crossroads.

Furthermore, even if the court focuses only on the customer list Scholten

sent, it is unclear why Scholten's motive for sending the list would require the

court to grant summary judgment in his favor. Under both the federal and

South Dakota state trade secret statutes, an individual misappropriates if he

discloses

> a trade secret of another without express or implied consent by a person
> who—at the time of disclosure. . . knew or had reason to know that the
> knowledge of the trade secret was—acquired under circumstances giving
> rise to a duty to maintain the secrecy of the trade secret or limit the use
> of the trade secret[.]

18 U.S.C. § 1839; *see* SDCL § 37-29-1 (substantially similar definition).

This definition does not require the defendant to disclose a trade secret

for a nefarious purpose. If the individual "knew or had reason to know that the

knowledge of the trade secret was . . . acquired under circumstances giving rise

to a duty to maintain the secrecy of the trade secret," the individual cannot

escape liability by simply arguing that he gave away the trade secret for a

benign reason. *See* 18 U.S.C. § 1839(5). It is immaterial whether Scholten sent

over the customer list for the purpose of addressing commissions or for the

purpose of benefitting Crossroads.

Here, the record contains a genuine dispute about whether Scholten

knew or had reason to know that the trade secret was acquired under

circumstances giving rise to a duty to maintain the secrecy of the trade secret

because he signed an acknowledgment form indicating that he received and

understood Jim Hawk's employee handbook. *See* Docket 157-16 at 14-15. This handbook directs employees to "not discuss the corporation's confidential business with anyone who does not work for [Jim Hawk]." Docket 157-56 at 2. Furthermore, the handbook provides that "giving confidential or proprietary information to competitors or other organizations…" is grounds for "immediate dismissal without warning." *See* Docket 157-57 at 2. Thus, the record provides sufficient evidence for a jury to conclude that Scholten knew or had reason to know that he had a duty to maintain this information as a trade secret, and it does not matter that he disclosed such trade secrets for purportedly innocent reasons.

Even if an individual can only misappropriate if he does so with the purpose of benefitting a competitor, Scholten testified during his deposition that he accessed the list of Jim Hawk's customers "for the benefit of Crossroads[.]" Docket 157-16 at 35. Thus, there is a genuine dispute about Scholten's purpose for sending the customer list.

In short, there is sufficient evidence in the record to show a genuine dispute about whether Scholten misappropriated trade secrets. The court denies Scholten's motion for summary judgment on Jim Hawk's claims of federal and South Dakota trade secret violations.

### 2. Mark Sneve

Sneve argues that Jim Hawk cannot demonstrate that he "took any company information with him when he resigned from his employment." Docket 132 at 38. But the record, viewed in the light most favorable to Jim

Hawk, shows that there is a genuine dispute of fact about whether Sneve took any of Jim Hawk's trade secrets. In fact, Jim Hawk has pointed to multiple sources in the record that suggest that Sneve knows of and is aware of Jim Hawk's pricing information, customer preferences, cost of services, and financial information including profit margins. *See, e.g.*, Docket 153 ¶¶ 39-42; Docket 157-17 at 8-9.

Sneve testified in his deposition that he did not share any of this information with anyone at Crossroads. Docket 157-17 at 9. But the record contains sufficient facts such that a jury could find otherwise. For example, Sneve's position at Crossroads is similar to what he did at Jim Hawk. *See id.* at 29. Sneve stated at one point that he wanted to "put [Jim Hawk] out of business" and "take all the business from [Jim Hawk]." Docket 157-37 at 6. Additionally, the record shows that Sneve intentionally misrepresented to multiple Jim Hawk employees that he was retiring, when in reality he was going to work for Crossroads. *See* Docket 157-38 at 7-8; Docket 157-22 at 31; Docket 157-36 at 4. These facts, when viewed in the light most favorable to Jim Hawk, show a genuine dispute of fact about whether Sneve shared insider information: a jury could discredit Sneve's testimony that he did not share secret information, and instead conclude that given his ill-will and misrepresentations to Jim Hawk, Sneve did in fact share Jim Hawk's secret information with Crossroads. Ultimately, witness credibility is a jury's province, not the court's. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

Finally, Sneve also knew or had reason to know that he had a duty to maintain the secrecy of this trade secret given that he also signed the employee handbook containing the above-mentioned provisions relating to Jim Hawk's directions on maintaining confidentiality. See Docket 157-17 at 10-11. Thus, the court denies Sneve's motion for summary judgment on Jim Hawk's federal and state trade secret claims.

### 3. Derek Falor

Derek Falor argues that the only evidence of him taking anything from Jim Hawk is a USB thumb drive containing customer information. Docket 132 at 38. But he argues that this action alone is insufficient because "there is no evidence that he used this information in his employment at Crossroads or that he otherwise shared this information with Crossroads' representatives." *Id.*

Viewing the record in the light most favorable to Jim Hawk, there is a genuine dispute as to whether Falor did in fact share the thumb drive's contents. For example, although Derek Falor testified that he did not access the thumb drive after leaving Jim Hawk or share the documents on the thumb drive with anyone, he also testified that he saved the information because he "wanted access" to it later on. Docket 157-12 at 18. Furthermore, the thumb drive contains a document that has the Crossroads label on it. *See* Docket 157-10 at 1. Viewing this evidence in the light most favorable to Jim Hawk, it is reasonable to infer that, Derek Falor accessed the flash drive after leaving Jim Hawk given the uploaded Crossroads document, despite his testimony to the contrary.

28

Derek Falor also knew or had reason to know that he had a duty to maintain the secrecy of this trade secret because he signed the employee handbook containing the above-mentioned provisions relating to Jim Hawk's directions on maintaining confidentiality. *See* Docket 153 at 16; Docket 157-12 at 6.

Thus, there is a genuine dispute over whether Derek Falor misappropriated trade secrets by accessing and sharing the thumb drive's contents with Crossroads, and the court denies his summary judgment motion on the federal and South Dakota trade secret claims.

#### 4. Michael Falor, Dave Jensen, and Tracy Thompson

Michael Falor, Jensen, and Thompson argue that Jim Hawk "cannot establish that [they] acquired alleged trade secrets through improper means." Docket 132 at 39.  They further argue that "any of [Jim Hawk's] information that was in their possession after the resignations was acquired in the normal course of their employment." *Id.*

As an initial matter, Jim Hawk need not prove these individuals used "improper means" to succeed on its misappropriation of a trade secret claim. Under 18 U.S.C. § 1839, an individual can misappropriate a trade secret if he discloses, without the consent of the trade secret's holder, the trade secret after "us[ing] improper means to acquire knowledge of the trade secret[,]" *or* the individual, at the time of disclosure, knew or had reason to know that the knowledge of the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret[.]" *See* 18 U.S.C. § 1839(B).

29

Thus, these defendants' focus on whether they used improper means to acquire the trade secrets is misplaced.

Furthermore, the record contains sufficient evidence to show a genuine dispute as to whether each of the defendants knew or had reason to know they had a duty to maintain the information as secret. Each of these defendants, like the others, signed and acknowledged the employee handbook containing directives on confidentiality. *See* Docket 157-13 at 13-14; Docket 157-14 at 19-20; Docket 157-18 at 14. Thus, the court now turns to whether the record, viewed in the light most favorable to Jim Hawk, shows that the three individuals disclosed any trade secrets.

Starting with Mike Falor, the record shows that he forwarded several pieces of information, including a credit application from a vendor, a customer list, and pricing information to his personal email while employed at Jim Hawk. *See* Docket 157-13 at 41-42, 75-82, 102-151. Mark Habben testified on behalf of Crossroads that Mike Falor forwarded the credit application because Mike Falor sought to "replicate the business" he was doing at Jim Hawk after he arrived at Crossroads. *See* Docket 157-19 at 29. Mike Falor also texted publicly unavailable vendor information to Mark Habben. *See* Docket 157-13 at 27, 48-72; Docket 153 ¶ 123. Viewing this evidence in the light most favorable to Jim Hawk, there is a genuine dispute of fact over whether Mike Falor misappropriated trade secret information. The court denies Mike Falor's motion for summary judgment on Jim Hawk's federal and South Dakota trade secret claims.

The record shows Jensen sent trade secret information to Crossroads. For example, Jensen sent Jim Hawk's vendor list and customer information to Crossroads. *See* Docket 157-14 at 35, 39-40, 49, 59-60, 65, 74-80; Docket 153 at 22. Thus, the court finds a genuine dispute of material fact as to whether Jensen misappropriated trade secret information. The court denies Jensen's motion for summary judgment on the trade secret claims.

Finally, with respect to Thompson, Thompson forwarded numerous things from his Jim Hawk email to his personal email, including several customer lists with financial and profit information, a link to a document including his own sales totals, and several history reports including customer names and profit information. *See, e.g.*, Docket 153 at 23-25; Docket 157-3; Docket 157-4 Docket 157-5; Docket 157-7; Docket 157-8; Docket 157-9; Docket 157-18 at 28-30; Docket 157-54. Curt Westphal, a Jim Hawk employee, testified that Thompson asked Westphal to send Thompson's customer lists to Thompson so that Thompson could "take [them] with [him]" to Crossroads. Docket 157-25 at 28. Thus, it is a reasonable inference for the fact finder to conclude that Thompson misappropriated trade secrets by giving Crossroads access to the items he sent to his personal email. The court thus denies Thompson's summary judgment motion on Jim Hawk's trade secret claims.

### 5. Crossroads

Crossroads argues that there is no specific evidence that it misappropriated any of Jim Hawk's trade secret information because "much of the information alleged to be at trade secret in this case was readily available to

Crossroads as a member within the industry." Docket 132 at 38. But this argument appears to be an argument for why the information Crossroads received was not a trade secret, not whether they misappropriated trade secret information. And as discussed above, there is a genuine dispute over whether the information Crossroads received constitutes a trade secret.

Furthermore, the record contains sufficient evidence that, when viewed in the light most favorable to Jim Hawk, indicates there is a genuine dispute over whether Crossroads misappropriated Jim Hawk's trade secrets. Specifically, there is a genuine dispute over whether Crossroads used Jim Hawk's trade secret when it knew, or had reason to know, that the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret. *See* 18 U.S.C. § 1839 (B)(ii). For example, during the Crossroads deposition, Crossroads admitted to receiving an email from Derek Falor with the subject line "Pricing comparison Tectran/Goodyear." *See* Docket 157-19 at 35. This email included an attachment that provided comparisons between what Jim Hawk can purchase items for compared to what it would cost to purchase it through a supplier. *See id.* at 191-93. In response to this email, Crossroads said, "Thanks, Derek. Are all/most of the prices from Hawk purchased through Vipar?" *See id.* at 36. Crossroads's own handbook acknowledges that it would violate Crossroads's policy if one of its own employees sent this kind of information to a competitor. *See id.* at 75 (listing price lists and financial information, among other items, to be confidential information not to be disclosed). In fact, Crossroads instructs

32

that disclosing this kind of information subjects an employee to disciplinary action, including termination. *See id.*

Thus, viewing this evidence in the light most favorable to Jim Hawk, Crossroads knew that Derek Falor had just given it inside information about prices that Jim Hawk was able to acquire certain parts for, which affects profitability. *See id.* at 36 ("The cheaper you buy [parts], the more opportunity to you have to sell [them] for less and/or maximize your profit."). The record contains sufficient evidence that there is a genuine dispute over whether Crossroads knew or had reason to know that Derek Falor acquired this information while owing a duty to Jim Hawk to keep it secret. The court denies Crossroads's motion for summary judgment on Jim Hawk's trade secret claims.

## II.    Jim Hawk's Tort Claims

Because this court has supplemental jurisdiction over Jim Hawk's state-law tort claims, it applies South Dakota law to such claims. *See Emmenegger v. Bull Mouse Tube Co.*, 324 F.3d 616, 624 n.9 (8th Cir. 2003). Defendants argue that Jim Hawk's common law claims are displaced by South Dakota's Unfirom Trade Secret Act (UTSA). *See* Docket 132 at 40. Jim Hawk argues that its tort claims are independent of its trade secret claims and thus are not displaced. *See* Docket 159 at 46-48. Further, it argues that even if its common law claims are based on defendants giving away secret information, the court should not grant summary judgment at this stage because the information could otherwise be confidential, and not a trade secret—and thus provide a basis for tort claims. *See id.* at 48-50.

The UTSA seeks to "make uniform the law . . . among states enacting [the UTSA]." SDCL § 37-29-8. The UTSA provides in relevant part:

> (a) Except as provided in subsection (b), this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.

> (b) This chapter does not affect . . . [o]ther civil remedies that are not based upon misappropriation of a trade secret . . . .

§ 37-29-7. Essentially, the UTSA "prevents a plaintiff from merely restating their trade secret claims as separate tort claims." *Weins v. Sporleder (Weins II)*, 605 N.W.2d 488, 491 (S.D. 2000). When analyzing a claim under the UTSA, "the issue is not what label the plaintiff puts on their claims." *Id.* Instead, the court should "look beyond the label to the facts being asserted in support of the claims." *Id.*

In *Weins II*, a manufacturer of livestock feed products sued a competitor for misappropriation of trade secrets and various tort claims. 605 N.W.2d at 489. On the case's first appeal, the South Dakota Supreme Court determined that the information in question was not a trade secret and that even if it was a trade secret, there was no misappropriation. *Id.* Thus, the court held that the trial court erred when it denied defendants' motion for judgment notwithstanding the verdict. *Id.* at 489-90. On the second appeal, the South Dakota Supreme Court held that once plaintiffs' trade secret misappropriation claim failed as a matter of law, plaintiffs could not then seek recovery under their tort claims because they "ar[o]se[] out of the alleged misappropriation of a trade secret" and thus were displaced by the UTSA. *Id.* at 492 (emphasis

34

added). The Supreme Court held that to have permitted recovery on the tort claims after denying judgment for the plaintiff under the UTSA would have rendered the displacement provision of the UTSA "meaningless." *Id.* But where a cause of action amounts to something more than or "apart from" the misappropriation of a trade secret, the court should allow that cause of action to proceed. *Id.* Indeed, the Court specifically noted that "[t]here may be other cases where a trade secret misappropriation is alleged and there is a further factual basis for fraud and deceit claims *apart from* the trade secret claim." *Id.* (emphasis added).

In *Mortgage Specialists, Inc. v. Davey*, the New Hampshire Supreme Court cited to *Weins II* in support of its holding that the UTSA "preempts claims that are based upon the unauthorized use of information, regardless of whether that information meets the statutory definition of a trade secret." 904 A.2d 652, 776-77 (N.H. 2006). There, the court found that the majority of courts analyzing the issue have found that the UTSA preempts claims arising out of the unauthorized use of information, even if that information does not ultimately meet the definition of a trade secret. *Id.* at 778*; see also Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404-05 (7th Cir. 2005) ("The dominant view is that claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets.") This approach is precisely what this court took in its previous order dismissing some of the defendants' tort claims. *See* Docket 78 at 8-9 ("Thus, to the extent the tort claims arise out of the alleged

35

misappropriation of confidential or trade secret information, the tort claims are displaced by the UTSA.").

The court rejects Jim Hawk's argument that the displacement analysis depends on whether the information defendants allegedly misappropriated were in fact trade secrets. Rather, the displacement analysis hinges on whether the tort claims are grounded in the same facts as the trade secret claims. *See Mortgage Specialists*, 153 N.H. at 780. Thus, the court must evaluate whether Jim Hawk's tort claims involve independent factual allegations, apart from disclosing confidential information.

Secondly, defendants argue that even if Jim Hawk's tort claims are not displaced, they fail as a matter of law. *See* Docket 132 at 44, 53, 55, 64-66. Thus, for the tort claims that survive a displacement analysis, the court must further determine whether they nonetheless fail as a matter of law.

### A. Tortious Interference with a Contract or Business Relationship Claim

Viewing the record in the light most favorable to Jim Hawk, the following evidence is relevant:

Shortly after Jim Hawk fired Scholten in December 2019, Scholten met with Crossroads for three hours and texted Mike Falor that Crossroads was "very interested in [Mike Falor], Dave, and Tracy and Mark Sneve as a package deal." *See* Docket 157-16 at 19; Docket 157-40 at 43. Derek Falor, after observing Scholten's behavior, said that he thought Scholten was "turning to vengeance." *See* Docket 157-45 at 2. A few months later, Scholten also texted

36

Mike Falor, "I will go after [Jim Hawk's] big customers, Van Wyk, K&J, Old
Dominion, Smith, Western Provision, Bennett." Docket 157-41 at 31 (cleaned
up). Scholten said that he "wanted to put Jim Hawk out of business." Docket
157-37 at 6.

In January 2020, Mark Habben texted Thompson that Crossroads would
"take care" of "all the whole team." *See* Docket 157-46 at 11. In March 2020,
Michael Falor texted Brian Johnson that Sneve had just resigned from Jim
Hawk by stating, "The sneve (sic) bomb just dropped!" Docket 157-43 at 16.
Johnson responded, "I was looking for the fireball!" *Id.* Further, because Sneve
had represented to Jim Hawk that he planned on retiring despite already
accepting a job at Crossroads, Johnson sarcastically texted Scholten, "I wonder
how Mark likes retirement." *See* Docket 157-41 at 68; Docket 157-15 at 15
(Johnson acknowledging he knew Mark was not actually retiring).

Scholten texted Jensen, who was still employed with Jim Hawk at the
time, encouraging Jensen to call Smith Trucking the next day. *See* Docket 157-
42 at 9. That next day, Jensen replied:

> I had a good talk with both Craig and Brian at Smith trucking this
> morning. Everything is good to go! Brian is going to *hold off on sending any*
> *more purchase orders over until Thursday*. He said he just *pulled their last*
> *trailer out of Jim Hawk's yard and he will reach out to crossroads for future*
> *service work.*

*Id.* at 22 (emphasis added). Scholten then texted Habben, "Smith Trucking just
called me and they will be bringing a trailer in for repairs tomorrow morning."
*Id.* at 40. Prior to these conversations, Crossroads had never provided service
work to Smith Trucking. *See* Docket 157-19 at 57.

Mike Falor and Sneve, the two of them (along with Derek Falor) also met with Smith Trucking while employed at Jim Hawk. *See* Docket 157-13 at 9, 11, 35, 41; Docket 157-13 at 26 (showing Mike Falor left Jim Hawk on March 12, 2020); Docket 157-17 at 6, 24 (showing Sneve left Jim Hawk on March 4, 2020). In February 2020, Smith Trucking began purchasing trailers from Crossroads, even though Smith had previously only ordered parts from Crossroads. *See* Docket 157-19 at 57. Mike Falor then texted Habben, "Mark, Congratulations on the Smith deal. So very happy!" Docket 157-46 at 37. Mike Falor similarly texted Scholten, "Crossroads got the Smith deal . . . Going to be a mushroom cloud from the south. Now that's teamwork!" Docket 157-41 at 29-30.

Jensen texted Habben and said that he "might as well" place an order through Crossroads given the "transition coming and the lead time on the straps." *See* Docket 157-19 at 30; Docket 157-46 at 33. Thompson similarly texted Habben and said that he was "quoting out a job but [] hoping to actually do it through [C]rossroads." Docket 157-46 at 33. Habben responded to Thompson and assisted Thompson with this transaction. *See* Docket 157-43 at 8-9. And Curt Westphal, Jim Hawk's vice president of distribution, testified that the week before Jensen and Thompson left, they stopped putting in customer stock orders, despite them normally doing so. *See* Docket 157-25 at 5, 28. At the time Jensen and Thompson placed orders with current-Jim Hawk customers through Crossroads, they were still employed with Jim Hawk. *See* Docket 157-46 at 33 (showing actions occurred in February 2020); Docket 157-

14 at 41 (showing Jensen left Jim Hawk on March 12, 2020); Docket 157-18 at 32 (showing Thompson left on March 12, 2020).

Additionally, Thompson, Jensen, and Derek Falor[3] all testified they had forwarded calls from their Jim Hawk phone to their personal cell phones once they left Jim Hawk. *See* Docket 157-14 at 50 (Jensen); Docket 157-18 at 35-36 (Thompson); Docket 157-12 at 14 (Derek Falor).

Under South Dakota law, to succeed on a claim of tortious interference with a contract or business relationship claim, the plaintiff must prove:

1. the existence of a valid business relationship or expectancy;
2. knowledge by the interferer of the relationship or expectancy;
3. an intentional and unjustified act of interference on the part of the interferer;
4. proof that the interference caused the harm sustained; and,
5. damage to the party whose relationship or expectancy was disrupted.

*Landstrom v. Shaver*, 561 N.W.2d 1, 16 (S.D.1997) (quoting *Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D.1992)); *see also Hohn v. Spurgeon*, 513 F.3d 827, 829 (8th Cir. 2008).

This claim requires a plaintiff to prove that there is "a 'triangle'—a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." *Landstrom*, 561 N.W.2d at 16. Here, Jim Hawk alleges that its customers, both current and

---

[3] Derek Falor also attended the meeting between Michael Falor, Sneve, and Smith Trucking, that resulted in Smith Trucking shifting its trailer business to Crossroads. *See* Docket 157-13 at 9, 11, 35; Docket 157-41 at 29-30.

prospective, were third-parties, and that defendants unjustifiably and intentionally interfered with the relationship between Jim Hawk's customers and Jim Hawk. *See* Docket 159 at 47. Because the displacement analysis hinges on specific facts as applied to each defendant, the court conducts this analysis for each defendant separately.

### 1. Crossroads

Jim Hawk's tortious interference claim against Crossroads depends in part on the same factual allegations of Crossroads receiving confidential information. *See, e.g.,* Docket 159 at 55-56 (describing evidence that individual defendants took Jim Hawk customer information and forwarded it to Crossroads, which Crossroads then used to set up customer accounts). But Jim Hawk also alleges facts that are fully independent of any alleged trade secret violation. For example, Jim Hawk alleges that Crossroads interfered with Jim Hawk's customers by intentionally hiring a large number of Jim Hawk's employees at the same time and thus harming Jim Hawk's ability to serve its customers. *See id.* at 60-61. Thus, to the extent that Jim Hawk's tortious interference claim against Crossroads is supported by more than the mere misuse of Jim Hawk's customer information, it is not displaced.

The court now considers whether, as a matter of law, Jim Hawk's claim against Crossroads fails. Crossroads argues that Jim Hawk cannot prove the third element of tortious interference; namely that it cannot establish an

intentional and improper[4] act of interference. *See* Docket 132 at 45-47; Docket 173 at 15. Crossroads argues that it was entitled to pursue business relationships with customers and vendors who had existing relationships with Jim Hawk. *See* Docket 132 at 47. Crossroads further stresses that it is not improper for it to recruit new employees, especially given that those employees are at-will. *See id.* at 46.

To determine whether a defendant acted improperly, South Dakota law considers the elements from the Restatement (Second) of Torts § 767. *See Gruhlke v. Sioux Empire Federal Credit Union, Inc.*, 756 N.W.2d 399, 408 (S.D. 2008). These factors include:

> the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the societal interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

Restatement (Second) of Torts § 767. "What constitutes improper interference will depend on the particular facts of each case with considerations of the [factors in the Restatement]." *Gruhlke*, 756 N.W.2d at 408.

As an initial matter, Crossroads appears to concede that it interfered with Jim Hawk's relationships with customers. *See* Docket 132 at 46-47 (disputing only whether Crossroads improperly interfered). In determining

---

[4] The South Dakota Supreme Court replaced the term "unjustified" with the word "improper" to align with the Restatement's language. *See Gruhlke v. Sioux Empire Federal Credit Union, Inc.*, 756 N.W.2d 399, 409 (S.D. 2008).

whether Crossroads acted improperly, the court considers Crossroad's motive in recruiting Jim Hawk's customers and employees. *See* Restatement (Second) of Torts § 767. While motivation of personal and financial gain is generally not enough to be improper, motivation "to injure another or to vent one's ill will on [Jim Hawk] serves no socially useful purpose" and "is almost certain to be held improper." *See Janvrin v. Continental Resources, Inc.*, 934 F.3d 845, 851 (8th Cir. 2019) (citing Restatement (Second) of Torts § 767 cmt. d.). Furthermore, " 'self interest is not a defense where a party's conduct is improper.' " *Brown v. Hanson*, 798 N.W.2d 422, 430 (S.D. 2011) (quoting *Table Steaks v. First Premier Bank, N.A.*, 650 N.W.2d 829, 837 (S.D. 2002)).

Here, Jim Hawk can point to sufficient facts in the record that, when viewed in the light most favorable to Jim Hawk, suggest Crossroads was motivated to injure Jim Hawk. In January 2020, Mark Habben texted Tracy Thompson that Crossroads would "take care" of "all the whole team." *See* Docket 157-46 at 11. In March 2020, Michael Falor texted Brian Johnson that Mark Sneve had just resigned from Jim Hawk by stating, "The [S]neve bomb just dropped!" Docket 157-43 at 16. Johnson responded, "I was looking for the fireball!" *Id.* Further, because Sneve had represented to Jim Hawk that he planned on retiring despite already accepting a job at Crossroads, Johnson sarcastically texted Scholten, "I wonder how Mark likes retirement." *See* Docket 157-41 at 68; Docket 157-15 at 15 (Johnson acknowledging he knew Mark was not actually retiring). These statements by Crossroad's agents show a material dispute over whether Crossroads acted with an improper purpose in targeting

42

and hiring many of Jim Hawk's employees. The court denies Crossroads's motion for summary judgment on this claim.

### 2. Alvin Scholten, Mike Falor, Mark Sneve, Dave Jensen, Tracy Thompson, Derek Falor

Starting with Alvin Scholten, although Jim Hawk points to evidence that Scholten shared secret information with Crossroads as a basis for its tortious interference of a business relationship, Jim Hawk also relies on other evidence as well. *See* Docket 159 at 55-58. For example, Jim Hawk alleges that Scholten intentionally diverted one of Jim Hawk's top customers, Smith Trucking, away from Jim Hawk. *See id.* at 57. Scholten texted Jensen, who was still employed with Jim Hawk at the time, encouraging Jensen to call Smith Trucking the next day. *See* Docket 157-42 at 9; Docket 157-14 at 41. That next day, Jensen replied:

> I had a good talk with both Craig and Brian at Smith trucking this morning. Everything is good to go! Brian is going to *hold off on sending any more purchase orders over until Thursday.* He said he just *pulled their last trailer out of Jim Hawk's yard and he will reach out to crossroads for future service work.*

*Id.* at 22. Scholten then texted Habben, "Smith Trucking just called me and they will be bringing a trailer in for repairs tomorrow morning." *Id.* at 40. Prior to these conversations, Crossroads had never provided service work to Smith Trucking. *See* Docket 157-19 at 56. Scholten's alleged actions here do not involve sharing confidential information with Crossroads, and thus to the extent Jim Hawk's tortious interference claim against Scholten is grounded in

actions independent of Scholten sharing confidential information, it is not displaced.

Jim Hawk's tortious interference with a business relationship claim against Scholten also survives summary judgment. Similar to Crossroads, there is a genuine dispute about whether Scholten acted improperly. As discussed above, motivation "to injure another or to vent one's ill will on [Jim Hawk] serves no socially useful purpose" and "is almost certain to be held improper." *See Janvrin*, 934 F.3d at 851. Jim Hawk fired Scholten in December 2019. *See* Docket 157-16 at 19. Shortly after, Scholten met with Crossroads for three hours and texted Mike Falor that Crossroads was "very interested in [Mike Falor], Dave, and Tracy and Mark Sneve as a package deal." Docket 157-40 at 43. Derek Falor, after observing Scholten's behavior, said that he thought Scholten was "turning to vengeance." *See* Docket 157-45 at 2. A few months later, Scholten also texted Mike Falor, "I will go after [Jim Hawk's] big customers, Van Wyk, K&J, Old Dominion, Smith, Western Provision, Bennett." Docket 157-41 at 31. Scholten said that he "wanted to put Jim Hawk out of business." Docket 157-37 at 6. Viewing the record in the light most favorable to Jim Hawk, Scholten had ill-will towards Jim Hawk, and thus there is a genuine dispute over whether Scholten acted improperly for purposes of Jim Hawk's tortious interference with a business relationship claim. Scholten's motion for summary judgment on this claim is denied.

Mike Falor, Sneve, and Derek Falor also met with Smith Trucking while employed at Jim Hawk. *See* Docket 157-13 at 9, 11, 35. In February 2020,

Smith Trucking began purchasing trailers from Crossroads, even though Smith had previously only ordered parts from Crossroads. *See* Docket 157-19 at 57. Mike Falor then texted Habben, "Mark, Congratulations on the Smith deal. So very happy!" Docket 157-46 at 37. Mike Falor texted Scholten, "Crossroads got the Smith deal . . . Going to be a mushroom cloud from the south. Now that's teamwork!" Docket 157-41 at 29-30. These actions did not involve Mike Falor or Sneve sending confidential information to Crossroads. Thus, Jim Hawk's tortious interference claim with a business relationship against Mike Falor and Sneve are not displaced.

Similarly, Jim Hawk's tortious interference with a business relationship claims against Dave Jensen, Tracy Thompson, and Derek Falor are, in part, separate from any allegation that they shared confidential information with Crossroads. For example, Jim Hawk alleges that Dave Jensen and Tracy Thompson placed orders with Crossroads for Jim Hawk customers while Dave Jensen was still employed with Jim Hawk. *See* Docket 159 at 54-55. Jim Hawk also alleges that Jensen, Thompson, and Derek Falor forwarded their Jim Hawk phone numbers to either their new Crossroads phone numbers or personal numbers so that they would continue to receive calls from Jim Hawk customers even after leaving Jim Hawk. *See id.* at 56.

Jensen texted Habben and said that he "might as well" place an order through Crossroads given the "transition coming and the lead time on the straps." *See* Docket 157-19 at 30; Docket 157-46 at 33. Thompson similarly texted Habben and said that he was "quoting out a job but [] hoping to actually

45

do it through [C]rossroads." Docket 157-46 at 33. And Curt Westphal, Jim Hawk's vice president of distribution, testified that the week before Jensen and Thompson left, they stopped putting in customer stock orders, despite them normally doing so. *See* Docket 157-25 at 5, 28. With regard to forwarding phones, Thompson, Jensen, and Derek Falor all testified they had forwarded calls from their Jim Hawk phone to their personal cell phones. *See* Docket 157-14 at 50 (Jensen); Docket 157-18 at 35-36 (Thompson); Docket 157-12 at 14 (Derek Falor). Because these claims are separate from claims that they shared confidential information, they are not displaced.

There is also a genuine dispute over whether Mike Falor, Sneve, Jensen, Thompson, and Derek Falor acted improperly given the "nature of [their] conduct" and the "proximity . . . of [their] conduct to the interference." Restatement (Second) of Torts § 767 cmt. d. When Mike Falor and Sneve met with Smith Trucking, they were still employed by Jim Hawk. *See* Docket 157-13 at 41 (showing that meeting with Smith happened in late February 2020); Docket *id.* at 26 (showing Mike Falor left Jim Hawk on March 12, 2020); Docket 157-17 at 6, 24 (showing Sneve left Jim Hawk on March 4, 2020).

Viewing the record in the light most favorable to Jim Hawk, this meeting resulted in them diverting business away from Jim Hawk to Crossroads. *See, e.g.*, Docket 157-41 at 29-30. At the time Jensen and Thompson placed orders with current-Jim Hawk customers through Crossroads, they were still employed with Jim Hawk. *See* Docket 157-46 at 33 (showing actions occurred in February 2020); Docket 157-14 at 41 (showing Jensen left Jim Hawk on

March 12, 2020); Docket 157-18 at 32 (showing Thompson left on March 12,

2020). Their actions directly benefitted Crossroads at the expense of Jim Hawk.

Similarly, when Jensen, Thompson, and Derek Falor forwarded calls from their

Jim Hawk cell phone number to their personal numbers, they directly usurped

calls that customers would have made to Jim Hawk and re-directed them to

Crossroads. These actions are sufficient to show a dispute over whether they

acted improperly. Thus, to the extent that Jim Hawk's tortious interference

with a business relationship claims against Sneve, Mike Falor, Thompson,

Jensen, and Derek Falor are grounded in facts that are not solely about them

sharing confidential information with Crossroads, the court denies Crossroad's

summary judgment motion on such claims.

**B. Tortious Interference with Jim Hawk's Employee Relationships**

After hiring Alvin Scholten, Crossroads hired eight then-Jim Hawk

employees: Mike Falor, Tracy Thompson, Dave Jensen, Derek Falor, Mark

Sneve, Nick Big Eagle, Caz Kohorst, and Taylor Larson. *See* Docket 157-19 at

8. After hiring so many of Jim Hawk's employees, Habben emailed Johnson,

"[Jim Hawk's] whole team except Bill [Forsling] would be gone, Ouch." Docket

124-33 at 1.

After Scholten joined Crossroads, Scholten continued to communicate

with then-Jim Hawk employees. For example, Thompson testified that while he

was still employed with Jim Hawk, Scholten told him that Jim Hawk may be

closing or selling the parts and service department and that his position may

be eliminated. *See* Docket 157-18 at 22. But Scholten admitted that he knew

47

the parts department employees, such as Thompson, would maintain their positions regardless of whether Jim Hawk sold the department. *See* Docket 157-16 at 24. Scholten also told then-Jim Hawk employees, Mike Falor and Jensen, that Jim Hawk was going to shut down or sell the parts department. *See id.* at 25; Docket 157-13 at 15-16. Michael Falor had not known about this news, and subsequently texted Scholten that he was "ready" to leave Jim Hawk. *See* Docket 157-13 at 15-16; Docket 157-40 at 71.

Under South Dakota law, a plaintiff is liable for interfering with an employee's relationship with his employer if there was in fact an employee-employer relationship, the plaintiff knew of this relationship, intentionally and improperly interfered with the relationship, the interference caused harm, and the employer suffered damages. *See Setliff v. Akins*, 616 N.W.2d 878, 889 (S.D. 2000); *see also Gruhlke.*, 756 N.W.2d at 409. An employee's status as being at-will does not foreclose a plaintiff from bringing forth this claim. *See Mueller v. Cedar Shore Resort, Inc.*, 643 N.W.2d 56, 68 n. 9 (S.D. 2002).[5]

Here, the same displacement analysis as discussed above will be applied to Jim Hawk's claim of tortious interference with its employee relationships. Jim Hawk argues Crossroads improperly interfered by coordinating and

---

[5] This claim is grounded in the same tort as tortious interference with a business relationship, because the South Dakota Supreme Court has recognized that an employer-employee relationship counts as a business relationship. *Mueller*, 643. N.W. 2d at 68 n.9. For clarity sake, however, the court separates these first two causes of action because the first claim centers on defendants' alleged interference with Jim Hawk's *customers*, while the second focuses on defendants' alleged interference with Jim Hawk's *employees*.

planning a mass exodus of then-Jim Hawk employees. *See* Docket 159 at 63.
Jim Hawk also argues that Scholten improperly attempted to recruit then-Jim
Hawk employees by giving them false information suggesting that Jim Hawk
would be selling or shutting down its parts department. *See id.* at 64. Because
none of these claims rely on allegations that Scholten or Crossroads gave away
or used confidential information, Jim Hawk's claim of tortious interference with
employment relations is not displaced.

Crossroads and Scholten argue that Crossroads was entitled to compete,
and thus cannot establish that they acted improperly. *See* Docket 132 at 54-
55. Starting with Crossroads, Habben described the impact of Crossroads
hiring many of Jim Hawk's then-employees at the same time by stating, "[Jim
Hawk's] whole team except Bill [Forsling] would be gone, Ouch." Docket 124-33
at 1. This message, along with the record as outlined above, when viewed in the
light most favorable to Jim Hawk, indicates that Crossroads acted with a
purpose to harm Jim Hawk. *See supra* at 43. The court finds there is a genuine
dispute as to whether Crossroads acted improperly in recruiting Jim Hawk's
then-employees, and thus denies Crossroads's motion for summary judgment
on this claim.

Jim Hawk's claim against Scholten also survives. Thompson testified that
while he was still employed with Jim Hawk, Scholten told him that Jim Hawk
may be closing or selling the parts and service department and that his
position may be eliminated. *See* Docket 157-18 at 22. But Scholten admitted
that he knew the parts department employees, such as Thompson, would

49

maintain their positions regardless of whether Jim Hawk sold the department. *See* Docket 157-16 at 24. Scholten also told then-Jim Hawk employees, Mike Falor and Jensen, that Jim Hawk was going to shut down or sell the parts department. *See id.* at 25; Docket 157-13 at 15-16. Michael Falor had not known about this news, and subsequently texted Scholten that he was "ready" to leave Jim Hawk. *See* Docket 157-13 at 15-16; Docket 157-40 at 71. Additionally, as discussed above, the court finds that there is a dispute about whether Scholten acted with an improper purpose because viewing the record in the light most favorable to Jim Hawk, Scholten acted with the intent to harm Jim Hawk. *See supra* at 44-45.

Scholten cites *Cenveo Corp. v. Southern Graphic Systems, Inc.*, 784 F.Supp. 2d 1130, 1140 (D. Minn. 2011) in support of its argument that an employee is entitled to assist a new employer in crafting offers for employees at his previous employer. *See* Docket 132 at 54-55. But unlike in *Cenveo*, where an employee only helped his current employer to develop a package to entire a former co-worker at his previous employer to leave the former employer, the record, as discussed above, contains evidence of Scholten misleading Jim Hawk employees and doing so for the purpose of harming Jim Hawk. *See Cenveo*, 784 F.Supp. 2d at 1140. Summary judgment is denied on Jim Hawk's claim against Scholten for tortious interference of employment relations.

### C. Breach of Duty of Loyalty

Viewing the record in the light most favorable to Jim Hawk, in addition to the above-mentioned findings, the following facts are relevant:

Before March 2020, Nicholas Big Eagle, Kohorst, and Larson all worked for Jim Hawk as mechanics. *See* Docket 153 at 8-9. Nicholas Big Eagle testified that he specialized in the wreck crew, and that he had more experience than many of the mechanics at Jim Hawk. *See* Docket 157-32 at 8. Timothy Big Eagle explained that Nicholas Big Eagle, "[knew] the process [of wrecks] . . . and [] is specialized," and that a new hire would "definitely not know anything" about how to do work similar to that done by Nicholas Big Eagle. *See* Docket 157-38 at 18. Kohorst testified that he had worked as a trailer mechanic for Jim Hawk for approximately four years. *See* Docket 157-23 at 4-5. And Larson served as a maintenance tech, which required certain skills. Docket 157-36 at 15.

While several of the mechanic defendants testified Jim Hawk's shop was not busy at times, Timothy Big Eagle, one of Jim Hawk's mechanics who became a service manager, testified that the shop had a "steady" stream of work. *See* Docket 157-32 at 16; Docket 157-36 at 19; Docket 157-38 at 4, 7. Once Nicholas Big Eagle, Kohorst, and Larson left for Crossroads, Jim Hawk had to "turn[] quite a few customers away" because they "didn't have the personnel to do the work." *See id.* at 7. This time was "hectic," and Jim Hawk had "a heck of a time trying to keep up." *See id.* at 18. Jim Hawk only had five remaining full-time mechanics to work in eight bays, when a wreck required at least two mechanics. *See id.*

Kohorst put in his two weeks' notice on March 12, 2020, but he had already told Crosswords he could start on March 16, 2020. *See* Docket 157-23

51

at 19-20. Larson and Nicholas Big Eagle planned to leave together on March 11, 2020 without giving Jim Hawk advance notice, and also agreed to pick up Kohorst's toolbox that morning. *See* Docket 157-36 at 9. On March 11, Nicholas Big Eagle and Larson arrived at Jim Hawk's garage early in the morning to load their toolboxes and to also avoid seeing any Jim Hawk employees. *See id.* at 10.

Under South Dakota law, "[a]n employee who has any business to transact on the employee's own account, similar to that entrusted to the employee by the employer, shall always give the employer the preference." SDCL § 60-2-13. The South Dakota Supreme Court set forth the legal principles surrounding an employee's duty of loyalty in *Akins*, 616 N.W.2d. 878. In *Akins*, Dr. Setliff alleged that Dr. Akins, a former doctor in Dr. Setliff's clinic, breached his duty of loyalty and other claims, after Dr. Akins left his employment with Dr. Setliff without warning and opened his own competing medical office. *Id.* at 884. Dr. Setliff alleged that Dr. Akins breached his duty of loyalty by using for his own benefit information he learned from Dr. Setliff, conducting business activities for his own benefit while in the employ of Dr. Setliff, taking advantage of Dr. Setliff's business opportunities, secretly communicating with and soliciting and/or hiring Dr. Setliff's employees while still employed by Dr. Setliff, and secretly communicating with or soliciting Dr. Setliff's patients while still employed by Dr. Setliff. *Id.* at 887.

Breach of duty of loyalty claims are "extremely fact-sensitive." *Id.* at 886. Such factual inquiry would determine whether an employee acted contrary to

his employer's interests while so employed. *Id.* The South Dakota Supreme Court recognized that while it is permissible for an employee to make arrangements for new employment with a competitor while still employed, an employee cannot solicit customers for a rival business or do similar acts that directly compete with the employer's business while still employed. *Id.* The South Dakota Supreme Court observed that it is the nature of the employee's preparations while employed by the employer that are significant in determining whether a breach has occurred. *Id.* Because a question of fact existed, the South Dakota Supreme Court reversed the trial court's grant of summary judgment that was in favor of Dr. Akins. *Id.* at 886-87.

In *Setliff v. Stewart*, which involved the same underlying facts as *Akins*, the South Dakota Supreme Court expanded its duty of loyalty analysis. 694 N.W.2d 859, 863, 867 (S.D. 2005). The court stated that an employee is not only permitted to make arrangements for new employment, but also "to make arrangements to compete in some cases." *Id.* at 867. The Supreme Court observed that the employee's preparations to compete with an employer are significant in determining whether the duty of loyalty has been breached. *Id.*

The South Supreme Court considered many factors in *Akins* and *Stewart*. While still employed, Dr. Akins and Stewart established a competing business and allegedly solicited patients and fellow employees to follow them at their rival business. *Akins*, 616 N.W.2d at 883-84; *Stewart*, 694 N.W.2d at 864. Dr. Akins was subject to an employment contract and held a position of trust or confidence within the clinic and was a crucial employee. *Akins*, 616 N.W.2d

53

at 885; *Stewart*, 694 N.W.2d at 869. He left his employment without providing notice and misled Dr. Setliff just a week earlier while discussing their future relationship. *Stewart*, 694 N.W.2d at 869-70. The departure of Dr. Akins was harmful to Dr. Setliff's business. *Id.* Because analysis of the breach of duty of loyalty claim is "extremely fact-intensive," no single fact is dispositive. *See Akins*, 616 N.W.2d at 886.

### 1. Scholten

Scholten argues that he cannot be liable for breach of duty of loyalty because the actions that Jim Hawk relies on to prove this claim are ones he took after Jim Hawk fired him. *See* Docket 132 at 56-57. He argues that an employee's duty of loyalty ends once his employment ends. *See id.* at 57. Jim Hawk argues that "[t]here are exceptions to the expiration of a fiduciary duty of loyalty where . . . a trusted employee takes confidential or trade secret information learned during the course of the employment relationship and uses it in a manner adverse to the employer." *See* Docket 159 at 68. In support, Jim Hawk cites *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App. 1998) and *In re TXCO Resources, Inc.*, 475 B.R. 781, 818 (W.D. Tex. 2012).

Scholten correctly states that generally, an employee's duty of loyalty ends once his employment ends. *See Akins*, 616 N.W.2d at 886 ("It is clear, however, that the employee owes a duty of loyalty to the employer, and the employee must not, *while employed*, act contrary to the employer's interests."); *see also Beef Products, Inc. v. Hesse*, 2019 WL 6037424 at *4 (D.S.D. Nov. 14,

2019) ("*While employed*, an employee cannot act contrary to his employer's interests." (emphasis added)). And although both cases that Jim Hawk cites discuss an exception to this general rule, the court need not—and cannot—decide whether this exception applies in this case, because the facts upon which Jim Hawk relies for this claim revolve around Scholten allegedly sharing confidential information with Crossroads. *See* Docket 159 at 69 ("[Scholten breached his] duty of loyalty to [Jim Hawk] to maintain its confidential and proprietary information and not to disclose it."). In fact, the two cases that Jim Hawk cites discuss the duty of loyalty in the context of whether the defendants misappropriated a trade secret. *See T-N-T Motorsports*, 965 S.W.2d at 22; *In re TXCO Resources*, 475 B.R. at 818. Thus, summary judgment is granted in favor of Scholten on Jim Hawk's claim against Scholten for breach of the duty of loyalty because it is displaced by its trade secret claims.

### 2. Mike Falor, Mark Sneve, Derek Falor, Dave Jensen, Tracy Thompson

Mike Falor, Sneve, Jensen, Thompson, and Derek Falor all make various arguments about why they did not breach their duty of loyalty. Docket 132 at 57-62. Starting with Mike Falor, Sneve, and Derek Falor, as mentioned above, these individuals met with Smith Trucking, one of Jim Hawk's largest customers, while employed at Jim Hawk. *See* Docket 157-13 at 9, 11, 35; Docket 157-41 at 31 (indicating Smith to be one of Jim Hawk's top customers). After this meeting, Smith Trucking began purchasing trailers from Crossroads, even though Smith had previously only ordered parts from Crossroads. *See*

Docket 157-19 at 56. Mike Falor then texted Habben, "Mark, Congratulations on the Smith deal. So very happy!" Docket 157-46 at 37. Mike Falor similarly texted Scholten, "Crossroads got the Smith deal . . . Going to be a mushroom cloud from the south. Now that's teamwork!" Docket 157-41 at 29-30. Mark Habben confirmed the centrality of these individuals' roles in recruiting Smith by telling Mike Falor, "Thanks! It was *all you guys!* This is going to be a good thing for all us." Docket 157-46 at 37 (emphasis added).

In the light most favorable to Jim Hawk, Mike Falor, Sneve and Derek Falor met with a Smith employee and convinced it to purchase trailers through Crossroads rather than Jim Hawk. For the same reasons as stated above, Jim Hawk's trade secret claims do not displace its breach of duty of loyalty claim against Mike Falor, Sneve, and Derek Falor because these facts do not involve them providing confidential information to Crossroads.[6] And a plaintiff can rely on the same conduct to provide a basis for a breach of duty of loyalty claim as it does for a tortious interference claim. *See West Plains, L.L.C. v. Retzlaff Grain Co. Inc.*, 870 F.3d 774, 786 (8th Cir. 2017). Further, there is a material dispute over whether these defendants actively competed with Crossroads rather than merely prepared for future competition. The court denies summary judgment to Mike Falor, Sneve and Derek Falor.

---

[6] Some of Jim Hawk's allegations against Derek Falor are displaced by its trade secret claims because Jim Hawk argues that Derek Falor breached his duty of loyalty by taking confidential information from Jim Hawk. *See* Docket 159 at 69-70. But because Jim Hawk alleges other facts independent of confidential information, Jim Hawk's breach of duty of loyalty claim is not completely displaced.

56

With respect to Jensen and Thompson as recounted above, Jensen texted Habben and said that he "might as well" place an order through Crossroads given the "transition coming and the lead time on the straps." *See* Docket 157-19 at 30; Docket 157-46 at 33. Thompson similarly texted Habben and said that he was "quoting out a job but [] hoping to actually do it through [C]rossroads." Docket 157-46 at 33. And Curt Westphal, Jim Hawk's vice president of distribution, testified that the week before Jensen and Thompson left, they stopped putting in customer stock orders, despite them normally doing so. *See* Docket 157-25 at 5, 28.

These actions do not involve the individual defendants sharing confidential information with Crossroads, and thus Jim Hawk's trade secret claims do not displace its breach of duty of loyalty claims for Thompson and Jensen. Additionally, viewing the record in the light most favorable to Jim Hawk, there is a genuine dispute over whether Thompson and Jensen impermissibly crossed the line past merely preparing for competition. Indeed, when Thompson and Jensen ordered parts for Crossroads while still at Jim Hawk, they committed a textbook example of a breach of duty of loyalty. *See, e.g., West Plains*, 870 F.3d at 786 (noting improper conduct to include "forming one's own *competing* business while still working for the employer."); *Eaton Corp. v. Giere*, 971 F.2d 136, 141 (8th Cir. 1992) ("[A]n employee owes his employer a duty of loyalty which prohibits him from . . . otherwise *competing with his employer*, while he is still employed."). Thompson and Jensen directly

diverted business from Jim Hawk to Crossroads. Summary judgment is inappropriate for this situation.

In summary, viewing the record in the light most favorable to Jim Hawk, there is a genuine dispute about whether each of these individuals (Mike Falor, Sneve, Derek Falor, Jensen, and Thompson) crossed the line from merely preparing for future employment with Crossroads to directly competing with Jim Hawk's then-existing customers. The court denies summary judgment on these claims.

### 3. Nicholas Big Eagle, Chaz Kohorst, Taylor Larson

Nicholas Big Eagle, Kohorst, and Larson argue that as at-will employees, they had the right to seek employment with Crossroads. *See* Docket 132 at 62. They further argue that "[a] decision by employees, particularly non-managerial employees, to leave their employer as a group is not a breach of the duty of loyalty." *Id.* Jim Hawk argues, however, that these defendants failed to give Jim Hawk any notice of their departure, and thus there is a material dispute over whether Nicholas Big Eagle, Kohorst, and Taylor breached their duty of loyalty to Jim Hawk. *See* Docket 159 at 80-81.

As an initial matter, as the court previously stated, Jim Hawk's breach of duty of loyalty claims against Nicholas Big Eagle, Kohorst, and Taylor are not displaced to the extent its claims rely on allegations unrelated to the disclosure of confidential information. *See* Docket 78 at 11. Turning to the claims' merits, the South Dakota Supreme Court's decision in *Stewart* drives the court's analysis for these defendants. *See* 694 N.W.2d at 869. In *Stewart*, the court

noted that "consistent with the highly fact intensive nature of the duty of loyalty inquiry," an employee's failure to disclose their intent to resign may— but not necessarily—constitute a breach of their duty of loyalty. *See id.* Indeed, an employee's duty to notify his employer turns, in part, on the harm it would cause to the employer. *See id.* In *Stewart*, the court noted that the defendant employee was a "crucial employee" and thus the employee's "abrupt departure with no notice resulted in general 'chaos'[.]" *Id.* The court further noted that a week before the employee left, he had "effectively misled" the plaintiff-employer. *Id.* at 870. As a result, the court upheld the jury's determination that the defendant employee had breached his duty of loyalty. *See id.*

The facts surrounding Nicholas Big Eagle, Kohorst, and Larson are similar to *Stewart.* First, viewing the record in the light most favorable to Jim Hawk, the record shows that all three mechanics were important to Jim Hawk's ability to service its customer orders. For example, Nicholas Big Eagle testified in deposition that he was part of the wreck crew, which did more specialized work than routine maintenance. *See* Docket 157-32 at 8. He further testified that he had more experience than many of the mechanics at Jim Hawk. *See id.* at 12. Timothy Big Eagle concurred, saying that Nicholas Big Eagle, "[knew] the process [of wrecks] . . . and [] is speclialized," and that a new hire would "definitely not know anything" about how to do the kind of work done by Nicholas Big Eagle. *See* Docket 157-38 at 18. Kohorst testified that he had worked as a trailer mechanic for Jim Hawk for approximately four years. *See*

59

Docket 157-23 at 5. And Larson served as a maintenance tech, which required certain skills. Docket 157-36 at 15.

Although several of the mechanic defendants testified the shop was not busy at times, Timothy Big Eagle, one of Jim Hawk's mechanics who became a service manager, testified that the shop had a "steady" stream of work to do. *See* Docket 157-32 at 16; Docket 157-36 at 19; Docket 157-38 at 4, 7. After Nicholas Big Eagle, Kohorst, and Larson resigned, Jim Hawk had to "turn[] quite a few customers away" because they "didn't have the personnel to do the work." *See id.* at 7. In fact, after they left, Timothy Big Eagle testified that the shop was "hectic," and he had "a heck of a time trying to keep up." *See id.* at 18. Jim Hawk was left short-staffed given it only had five remaining fulltime mechanics to work in eight bays, when a wreck required at least two mechanics. *See id.*

Second, Kohorst affirmatively misrepresented to Timothy Big Eagle that he was putting in his two weeks' notice on March 12, 2020, when he had already told Crosswords he could start on March 16, 2020. *See* Docket 157-23 at 19-20. And although the court is unaware of any affirmative misrepresentations that Nicholas Big Eagle or Larson made to Jim Hawk about their continued employment, the record suggests that at the very least they knew that they were going to leave at the same time. Taylor Larson admitted that he and Nicolas Big Eagle had planned to leave on March 11, 2020, and that they had also agreed to pick up Kohorst's toolbox that morning. *See* Docket 157-36 at 9. They further agreed not to give Jim Hawk any notice of

60

their plan to leave. *See id.* And in addition to Kohorst providing misleading information about when he would leave, neither Nicholas Big Eagle nor Larson told Jim Hawk about their intention to leave, despite knowing they would be leaving at the same time. *See* Docket 157-23 at 19-20 (showing Kohorst providing two weeks' notice despite knowing he would begin working at competitor sooner); Docket 157-32 at 32 (showing Nicholas Big Eagle failed to give advance notice to Jim Hawk); Docket 157-36 at 9 (showing Larson failed to give advance notice to Jim Hawk). In fact, Nicholas Big Eagle and Larson arrived at Jim Hawk's garage early in the morning to load their toolboxes and to also avoid seeing any Jim Hawk employees. *See* Docket 157-36 at 10.

These facts are similar to those in *Stewart*, because in both instances, the employees had important positions and their failure to give notice caused significant havoc. *See Stewart*, 694 N.W.2d at 869; Docket 157-38 at 18. Additionally, both cases involved situations where the employees either misled their employers about their intentions of when they would leave the company, or purposefully kept their intentions secret knowing that multiple co-workers would also be leaving at the same time. *See Stewart*, 694 N.W.2d at 869; Docket 157-36 at 9; Docket 157-32 at 32.

Nicholas Big Eagle, Kohorst, and Larson cite *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 13 F. Supp. 3d 465, 481 (E.D. Penn. 2014) for the proposition that employees who know that their mass resignation would "cripple" the plaintiff-employer, alone, is not sufficient to establish a breach of their duty of loyalty. *See* Docket 132 at 62. This case does not alter the court's

analysis. First, the court applies South Dakota substantive law, and here, the South Dakota Supreme Court's decision in *Stewart* allows for a plaintiff employer to succeed on a breach of duty of loyalty claim against individual employees who fail to give notice of their departure, depending on the specific facts. *See Stewart*, 694 N.W.2d at 869. Furthermore, unlike in *Ozburn-Hessey*, where the court noted that the individual defendants "worked diligently to assist with the transition," there is no such evidence in this case. 13 F. Supp. 3d at 481. Thus, the court finds *Ozburn-Hessey* distinguishable.

Because deciding whether an employee breached his duty of loyalty is a highly fact-intensive inquiry, and because the record, when viewed in the light most favorable to Jim Hawk, contains significant questions about how much harm the mechanic defendants caused to Jim Hawk by collectively resigning without providing Jim Hawk any notice, summary judgment is inappropriate. The court denies mechanic defendants' motion on Jim Hawk's breach of duty of loyalty claims.

### D. Unfair Competition

Crossroads, Scholten, Michael Falor, Sneve, Jensen, Thompson, and Derek Falor argue that Jim Hawk's unfair competition claim duplicates its other tort claims of tortious interference with a business relationship, tortious interference with an employee relationship, and breach of the duty of loyalty. *See* Docket 132 at 63-64. Thus, these defendants argue the court must dismiss them. *See id.* at 64.

Under South Dakota law, "[t]he tort of unfair competition does not have specific elements." *Akins*, 616 N.W.2d at 887. Rather, "it describes a general category of torts which courts recognize for the protection of commercial interests." *Id.* (citations omitted). "[D]amages for unfair competition results from satisfying the elements of an underlying tort." *Id.* at 887-88. South Dakota law recognizes that tortious interference with a business relationship, tortious interference with an employment relationship,[7] and breach of duty of loyalty can provide a basis for an unfair competition claim. *See id.* at 888; *Raven Industries, Inc. v. Lee*, 783 N.W.2d 844, 851 (S.D. 2010) (allowing tortious interference with employment relationship claim to form basis for unfair competition claim). In *Akins*, the South Dakota Supreme Court found summary judgment inappropriate when the record showed a genuine issue of material fact about whether the Defendant had breached his duty of loyalty to the plaintiff which resulted in unfair competition. *See Akins*, 616 N.W.2d at 888. Because the unfair competition claims largely rely on the same facts as the above-named torts, and because the above-named torts survive the displacement analysis, so too do Jim Hawk's unfair competition claims.

Turning to the claims' merits, the court finds genuine disputes of fact over whether Crossroads, Scholten, Thompson, Jensen, Michael Falor, and Derek Falor tortiously interfered with Jim Hawk's customers. There are

---

[7] As noted above, tortious interference with an employee relationship resides within a tortious interference with a business relationship under South Dakota law. *See Mueller*, 643 N.W. 2d at 68 n.9.

genuine disputes of fact over whether Crossroads and Scholten tortiously interfered with Jim Hawk's employees and whether all individual defendants except Scholten breached their duty of loyalty to Jim Hawk. Thus, summary judgment on Jim Hawk's unfair competition claims against each defendant is denied to the extent such claims are grounded in the above-named independent torts. The court, however, finds that Jim Hawk's unfair competition claims are "coterminous with and subsumed" within these torts. *See Venture Commc'ns Coop., Inc v. James Valley Coop. Tel. Co.*, 492 F. Supp. 3d 946, 964 (D.S.D. 2020). Thus, defendants are entitled to summary judgment on Jim Hawk's unfair competition claims to the extent they seek to assert separate causes of action beyond their tort claims.

### E. Civil Conspiracy

All defendants argue that the court must dismiss the civil conspiracy claims because all of Jim Hawk's common law tort claims against them fail, and thus Jim Hawk cannot establish the necessary underlying tort required for a civil conspiracy claim. *See* Docket 173 at 23. "A civil conspiracy is, fundamentally, an agreement to commit a tort." *Yankton Cnty. v. McAllister*, 977 N.W.2d 327, 341 (S.D. 2022) (citation omitted). To prove a prima facie case of civil conspiracy, the plaintiff must show

> (1) two or more persons;
> (2) an object to be accomplished;
> (3) a meeting of the minds on the object or course of action to be taken;
> (4) the commission of one or more unlawful overt acts; and
> (5) damages as the proximate result of the conspiracy.

*Stewart*, 694 N.W.2d at 866-67. Civil conspiracy is "not an independent cause of action, but is 'sustainable only after an underlying tort claim has been established.' " *Kirlin v. Halverson*, 758 N.W.2d 436, 455 (S.D. 2008) (citations omitted).

Defendants argue only that Jim Hawk's civil conspiracy claims fail because the underlying tort claims against them fail. *See* Docket 132 at 64-65; Docket 173 at 23. Defendants do not argue that there is no genuine dispute of material fact as to any of the elements of civil conspiracy. As discussed above, each defendant faces at least one surviving underlying tort claim. And because each of the defendants faces an underlying tort that is not displaced, the civil conspiracy claim also survives a displacement analysis. Thus, the court denies summary judgment for each defendant on civil conspiracy.

### F. Unjust Enrichment

"Unjust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.' " *Hofeldt v. Mehling*, 658 N.W.2d 783, 788 (S.D. 2003) (citation omitted). "A party alleging unjust enrichment must show that the other party both received and knew he was receiving a benefit. Additionally, it must be inequitable to allow the enriched party to retain the benefit without paying for it." *Huston v. Martin*, 919 N.W.2d 356, 366 (S.D. 2018).

Unjust enrichment is an equitable remedy, and "[a]n essential element to equitable relief is the lack of an adequate remedy at law." *Rindal v. Sohler*, 658 N.W.2d 769, 772 (S.D. 2003). Before addressing the claim's merits, the court

must first determine this element. *See Paweltzki v. Paweltzki*, 964 N.W.2d 756, 769 (S.D. 2021) (describing this inquiry as the "initial question"). If there is an adequate remedy of law available, the court must dismiss the unjust enrichment claims. *See Rindal*, 658 N.W.2d at 772-73.

Tort claims provide an adequate remedy at law. *See Paweltzki,* 964 N.W.2d at 769. In *Paweltzki*, two individuals brought a claim of unjust enrichment against another. *See id.* at 768. The two individuals brought claims of breach of contract, breach of fiduciary duty, civil theft, and conversion. *See id.* at 769. A jury heard the case and declined to provide them relief on these claims. *See id.* The trial court similarly denied them relief on their equitable claim of unjust enrichment. *See id.* at 764. The individuals appealed the trial court's denial of equitable relief, and the South Dakota Supreme Court affirmed, reasoning that their breach of contract, breach of fiduciary duty, civil theft, and conversion claims provided an adequate remedy for them. *See id.* at 764, 769. The Court continued that "the fact that the jury found [the two individuals] did not prove their legal claims does not afford [the two individuals] a second bite of the apple to seek equitable relief for the exact same conduct." *Id.* at 769.

The reasoning in *Paweltzki* applies equally in this case. Although breach of contract is not alleged here, *Paweltzki's* holding did not hinge on the presence of a breach of contract claim: there were other tort claims that provided the two individuals an adequate remedy at law even absent the breach of contract claim. *See id.* Thus, regardless of whether Jim Hawk

succeeds on its various claims of tortious interference of a business relationship, tortious interference of an employee relationship, breach of duty of loyalty, or unfair competition, it has an adequate remedy at law. *See* SDCL §§ 21-3-1 (providing general measure of damages for tort claims). Because Jim Hawk has an adequate remedy at law for each defendant, the court grants defendants' motion for summary judgment on Jim Haw's unjust enrichment claims against all defendants.

### G. Defamation

Viewing the facts in the light most favorable to Jim Hawk, the following additional facts are relevant to this claim:

Jim Hawk III told Scholten about the potential sale of the parts department, but said that the parts department employees would keep their jobs even if Jim Hawk sold the parts department. *See* Docket 166 ¶¶ 83-86. Scholten knew that the employees in the parts department would keep their jobs. *See* Docket 157-16 at 24. By November 2019, Jim Hawk was no longer actively discussing the sale of the parts department, which Scholten knew. *See* Docket 166 at ¶¶ 87-88; Docket 157-33 at 29. In January 2020, Clinton Carter a vice president of parts and aftermarket at Jim Hawk, testified that Carter told Michael Falor that the sale was on the "back burner." *See* Docket 157-24 at 19-20.

After Jim Hawk fired Scholten, Scholten then told Thompson, Michael Falor, and Dave Jensen that Jim Hawk would potentially sell or close the parts department. *See* Docket 157-16 at 24-25; Docket 157-13 at 16. Thompson

testified that Scholten told Mike Falor, who then told Thompson, that Thompson's position would "likely end or become owned by a different company." Docket 157-18 at 22. Scholten denied telling Thompson that Thompson would lose his job. Docket 157-16 at 24-25

Scholten argues that Jim Hawk's defamation claim fails as a matter of law because Scholten's statements were either true or incapable of being true or false and thus an unactionable prediction. *See* Docket 132 at 66-67. Thus, Scholten urges the court to grant summary judgment on Jim Hawk's defamation claim. *Id.* Jim Hawk argues summary judgment is inappropriate because the record shows a genuine dispute over whether Scholten's statements were in fact true. *See* Docket 159 at 85.

Under South Dakota law, a person can defame another by libel or slander. *See* SDCL § 20-11-2; *Paint Brush Corp., Parts Brush Div. v. Neu*, 599 N.W.2d 384, 398 (S.D. 1999). As relevant here, South Dakota provides that slander is a

> [F]alse and unprivileged publication . . . which [] [t]ends directly to injure him in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit[.]

SDCL § 20-11-4. Although the First Amendment protects "pure" opinions, opinions may still be actionable if it "impl[ies] a false assertion of fact." *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-19 (1990) (rejecting assertion that

First Amendment categorically protects all opinions). "Whether a statement implies [an objective fact] is a question for the jury." *See Paint Brush*, 599 N.W.2d at 397; *see also Lundell Mfg. v. Am. Broad. Co.*, 98 F.3d 351, 358 (8th Cir. 1996) (noting that whether an opinion falsely asserts a fact is a question for the jury).

Even if a jury finds a statement to assert a fact, the question remains whether such an assertion is true. *See* SDCL § 20-11-2 (defining slander as a *false* publication); *Guilford v. Nw. Pub. Serv.*, 581 N.W. 2d 178, 180 (S.D. 1998). "The truth of a defamatory statement is measured by the ordinary implication of the words at the time the statement was made . . . ." *Guilford*, 581 N.W.2d at 180. (citation omitted).

Here, Jim Hawk's defamation claim against Scholten does not rely on any allegations that Scholten shared confidential information with Crossroads, and thus it survives the displacement analysis. A reasonable jury could find that Scholten's statements asserted a fact because there is a genuine dispute about whether Scholten told Thompson, Michael Falor, or Dave Jensen that they might lose their job. After Jim Hawk fired Scholten, Scholten then told Thompson, Michael Falor, and Dave Jensen that Jim Hawk would potentially sell or close the parts department. *See* Docket 157-16 at 24-25; Docket 157-13 at 16. Scholten testified that he did not tell Thompson that Thompson would lose Thompson's job, and Michael Falor similarly testified that Scholten did not say whether anyone in the parts department would lose their jobs. *See* Docket 157-13 at 15-16; Docket 157-16 at 24-25. But Thompson testified that

Scholten told Mike Falor, who then told Thompson, that Thompson's position would "likely end or become owned by a different company." Docket 157-18 at 22. A reasonable jury could find that Scholten's statement about the potential to lose one's job is a statement of fact. Further, even if Scholten only said that the parts department would be sold or would close, a reasonable jury could find that such a statement impliedly asserts the employees could lose their job. Viewing the evidence in the light most favorable to Jim Hawk, a genuine dispute exists about whether Scholten told anyone that they would lose their job and whether that asserts an objective fact. The court will next consider whether there is a dispute over whether Scholten's statements were true.

Turning to the record, Jim Hawk III told Scholten about the potential sale of the parts department. *See* Docket 166 ¶ 84. Jim Hawk III also told Scholten that the parts department employees would keep their jobs even if Jim Hawk sold the parts department. *See id.* ¶ 86. Scholten was aware that the employees in the parts department would keep their jobs. Docket 157-16 at 24. According to Jim Hawk III, discussions about whether the sale would actually go through had stopped by November 2019, and Jim Hawk III informed Scholten about this new development prior to Scholten leaving Jim Hawk. *See* Docket 166 at ¶¶ 87-88; Docket 157-33 at 29. In January 2020, Clinton Carter a vice president of parts and aftermarket at Jim Hawk, testified that Carter told Michael Falor that the sale was on the "back burner." *See* Docket 157-24 at 19-20.

70

The court finds a material dispute exists about the truthfulness of whether Jim Hawk really was going to sell its parts department. Further, if a jury concluded Scholten's statements asserted that Thompson, Michael Falor, or Jensen might lose their jobs, the record shows at the very least a genuine dispute over whether that is true.

In summary, genuine disputes exist regarding Scholten's statements—whether he made certain statements, what those statements asserted, if anything, and whether such assertions were true. These questions are for the jury to decide. The court denies Scholten's motion for summary judgment on Jim Hawk's defamation claim.

## CONCLUSION

A genuine dispute of material fact exists regarding whether Crossroads, Scholten, Mike Falor, Sneve, Jensen, Thompson, and Derek Falor misappropriated trade secrets. The court denies these defendants' motion for summary judgment on the federal and state law trade secret claims.

The only tort claim that fails a displacement analysis is Jim Hawk's breach of duty of loyalty claim against Scholten. Thus, the court grants Scholten's motion for summary judgment on Jim Hawk's duty of loyalty claim against Scholten. All remaining tort claims survive a displacement analysis.

Genuine disputes of material fact exist in all remaining claims except for Jim Hawk's unjust enrichment claims against Crossroads, Scholten, Mike Falor, Sneve, Jensen, Thompson, and Derek Falor. Thus, the court grants

defendants' motion for summary judgment on Jim Hawk's unjust enrichment claims against Crossroads, Scholten, Mike Falor, Sneve, Jensen, Thompson, and Derek Falor. The court denies all remaining motions for summary judgment because it finds a genuine dispute of material fact exists in all remaining claims.

Thus, it is ORDERED:

(1) that the defendants' motion for summary judgment (Docket 121) is granted in part and denied in part;

(2) that Crossroads's, Scholten's, Mike Falor's, Sneve's, Jensen's, Thompson's, and Derek Falor's motions for summary judgment on Jim Hawk's claim under 18 U.S.C. § 1836 and SDCL § 37-29-1 are DENIED;

(3) that Crossroads's, Scholten's, Mike Falor's, Sneve's, Jensen's, Thompson's, and Derek Falor's motions for summary judgment on Jim Hawk's claim of tortious interference with business relations is DENIED;

(4) that Crossroads's, Scholten's, Mike Falor's, Sneve's, Jensen's. Thompson's, and Derek Falor's motions for summary judgment on Jim Hawk's claim of tortious interference with employment relations is DENIED;

(5) that Scholten's motion for summary judgment on Jim Hawk's claim of breach of duty of loyalty is GRANTED;

(6) that Mike Falor's, Sneve's, Jensen's, Thompson's, Derek Falor's, Nicholas Big Eagle's, Kohorst's, and Larson's motions for summary judgment on Jim Hawk's claim of breach of duty of loyalty is DENIED;

(7) that Crossroads's, Scholten's, Mike Falor's, Sneve's, Jensen's, Thompson's, and Derek Falor's motions for summary judgment on Jim Hawk's claim of unfair competition is DENIED;

(8) that Crossroads's, Scholten's, Mike Falor's, Sneve's, Jensen's, Thompson's, and Derek Falor's motions for summary judgment on Jim Hawk's claim of civil conspiracy is DENIED;

(9) that Crossroads's, Scholten's, Mike Falor's, Sneve's, Jensen's, Thompson's, and Derek Falor's motions for summary judgment on Jim Hawk's claim of unjust enrichment is GRANTED; and

(10) that Scholten's motion for summary judgment on Jim Hawk's defamation claim is DENIED.

Dated February 8, 2023.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE